No. 1197.—WILLIAM D. SMITH *v.* CHARLES D. STEWART, et. als.

The exchange of prisoners between the sovereign and the insurgent, engaged on the one side by force of arms to subdue the rebellion, and on the other to establish their independence, does not of itself constitute the insurgent a belligerent power.

The blockade of the insurgent ports by the sovereign does not constitute the insurgent a belligerent within the sense and meaning of the term "belligerent" as used in international law, because the sovereign might accomplish the same result by interdicting commerce through those ports by municipal regulations.

The fact that a revolted province or portion of a country may have acquired the status and position of a belligerent power does not *ipso facto* give it the position and status of a *de facto* government. A government *de facto* arises only where the established government has been subverted by successful rebellion, and the new government exercises undisputed sway for the time being over the entire country.

In the late conflict between the United States and the so called Confederate States, before the the Confederate States could have claimed the distinction of a *de facto* government, it was necessary for them to show undisputed control over the whole country claimed, with the ability to maintain that position.

A recognition, by any other independent power, of the Confederate States as an independent power before they had demonstrated their ability to maintain their new government would have been a *casus belli* between the United States and such power.

ON MR. CHIEF JUSTICE LODELING'S OPINION—ON REHEARING.

Prescription runs against all persons, except such as are included in some exception established by law. C. C. 3487. The existence of war is not among the exceptions established by law that will work an interruption or suspension of prescription.

The inability to sue will not avail against the plea of prescription, except in the cases specially excepted by law. C. C. 2512, 3488.

The maxim *contra non valentem agere non currit prescriptio* has no application in our system of jurisprudence. Where the Legislature has prescribed rules regulating prescription, and enumerated the causes that interrupt or suspend prescription, the courts will admit no other exceptions than those made by the law.

APPEAL from the Parish of Pointe Coupee, Seventh Judicial District, Cooley, J. Race, Foster & E. T. Merrick and A. Provosty for plaintiff and appellee; Edward Philips for defendant and appellant.

TALIAFERRO, J. The plaintiff in this action alleges that the defendant Charles D. Stewart and eight others in April, 1862, destroyed by fire two hundred and seventy-five bales of cotton, the property of plaintiff, which he avers were worth eighty-five thousand dollars. He prays judgment *in solido* against the defendants for that sum with interest and costs.

The defendants filed separate answers. In the court below, the case was continued as to all the defendants except Stewart, between whom and the plaintiff the present controversy lies. Judgment was rendered in favor of the plaintiff for twelve thousand dollars, and the defendant appealed.

The defendant's answer denies that the cotton belonging to plaintiff was burned at the time specified; and avers that if it were, it was burned by the militia of Pointe Coupee parish, acting under orders from the regularly constituted authorities of the State, and specifies as constituting those authorities the Governor, in his capacity of commander

in chief of the army and navy of the State, and of the militia thereof, and others, subordinate officers of the militia of the State; as well as by the authority of and under the orders of the officers of the Confederate States Government, whose orders and authority were at that time obligatory and binding upon the defendant, and which he was compelled to obey. He avers that at that time the militia of the parish were acting under orders from the commander in chief; that he was compelled to be a member of the regiment of Pointe Coupee militia, and that as such, nothing was done by him except what he did by the orders of officers whose commands he could not disobey. He pleads the prescription of one year in bar of the plaintiff's action.

The issues made in this case are—

*First.*—Is the action prescribed?

*Second.*—Was the authority under which the defendant acted a lawful authority?

*Third.*—Did he act under compulsion?

And *first* as to the question of prescription.

The learned and able opinion delivered in this case by the judge *a quo* enables us without difficulty to arrive at a satisfactory conclusion under this head. It is shown that from the time of the capture of New Orleans by the national forces in April, 1862, a continuous state of alarm and agitation prevailed in the parish of Pointe Coupee and the adjacent country, during the remainder of the war. Especially from the beginning of the year 1863 to the spring of 1865, the parish of Pointe Coupee was scourged by alternate raids of the military forces of both the hostile parties. Battles and skirmishes were frequent; while that state of affairs continued the people were panic stricken from the danger with which they were surrounded. Perturbation and terror were in the ascendant. In that district of country at that time the Ciceronian maxim "*Silent leges inter arma*," was fully illustrated. It is shown that during the year 1862, after the plaintiff's cause of action arose, there was only one term of court held in the parish, and that that was a mere formal opening of the court without the purpose of transacting business. That there was no court held during the years 1863 and 1864; and that the first court held afterwards was at the December term, 1865, under the Constitution of 1864; there having been but the one court, and that a mere nominal one, from the twenty-ninth of April, 1862, to the first Monday of December, 1865. It is shown that the defendant, shortly after the burning of the plaintiff's cotton, removed to Texas, where he remained three years. The petition in this case was filed on the third day of January, 1866, and the citation served on the fourteenth of March of the same year. But were the officers and the judge of that court, whose sittings were of such rare occurrence, officials deriving their commissions and authority from a legal source? It is contended that the contrary has not been proved, and admitting

the court to have been incompetent, still the plaintiff by diligence might have filed his suit and had citation served and thus have been enabled to save his claim from prescription. By the expression "of competent jurisdiction or not" in article 3484 of the Civil Code, relied upon by the defendant, we understand courts of constitutional and legal origin, although incompetent as to jurisdiction of the subject matter, It is shown that the State in its then abnormal condition, passed an edict by which suitors who had not sworn allegiance to the Confederate authorities, were prohibited from instituting suits in the courts; and from this the political status of the officers of these courts may readily be inferred. In view of the confusion and dismay of the time and the general distraction of the country, it is not reasonable to expect diligence to be used in the prosecution of legal rights. In the furor and excitement of that period, the closing of the courts, of more than doubtful legality if open, and the general neglect of all business, except that of war, it would have been a vain and useless thing for the plaintiff to institute an action; and had it been practicable, it doubtless would have brought odium if not danger upon him to have instituted the present action.

We think the evidence fully warrants us to determine that in this case there was a suspension of prescription under the equitable principle invoked by the plaintiff, *contra non valentem agere non currit prescriptio.*

It is in consonance with the spirit of our laws and the jurisprudence of the State to recognize the rule where facts obviously show the equity of its admission. 11 An. p. 730 and cases there cited.

*Second.*—Was the authority under which the defendant acted a lawful authority?

This inquiry, seemingly, though we apprehend not necessarily, involves the consideration of the much mooted question, did the late Confederate States constitute a government *de facto?*

We regard this question rather as a political than a legal one. It does not in our view come properly within the range of judicial action. Courts should be governed in questions of this character by the authoritative declarations of the national government. Authorities are not wanting to sustain this opinion. But, it is urged upon us that the action of the general government during the war towards the States lately in rebellion, was such as to recognize them as a belligerent power, and as having a government *de facto;* and that they have been so acknowledged by other powers. This subject has been pressed upon our consideration with much ability and zeal in this case, as well as in others, and we deem it proper to examine it.

In entering unwillingly upon this task, we shall first inquire into the character of this alleged recognition of the late Confederate States as a belligerent power by the United States government. When inde-

pendent powers, governments *de facto et de jure*, engage in war against each other, they are called belligerents. Certain recognized rules and usages applicable to their condition of hostility and to their relations to neutral powers are called belligerent rights. The terms belligerents and belligerent rights are properly applicable only to sovereign powers engaged in war. In all other cases they apply *sub modo*, and in a limited and qualified sense. In the case of sovereign powers engaged in war they recognize each other as sovereigns. In the case of rebellions where one party strives to obtain its independence and the other to reduce the insurgent to obedience, no such recognition occurs. Yet, in the latter case, modern warfare admits, in the interest of humanity, the humane treatment and exchange of prisoners; a concession to that extent, of a belligerent right in favor of the insurgent power. In blockading the Southern ports during the late war the United States government chose to exercise a belligerent right, when as a sovereign, it might have accomplished the same object by interdicting commerce through those ports by municipal regulations. This act of blockading the Southern ports and the exchange of prisoners are construed into a recognition by the United States of the alleged status of the Confederate States as a belligerent power. But constructive belligerency and constructive governments *de facto* are novel elements of international law, and not yet incorporated we imagine in the law of nations even in "its newest state." What is the evidence that the late insurgent States were ever recognized as constituting a *de facto* government either by the United States or any other power? It is not shown, nor, we imagine, can it be, that any formal declaration of such recognition has ever been made by any government, by the issuing of any proclamation or State paper importing a national act. No ambassador, minister plenipotentiary, charge de affairs or other functionary of that order was ever sent to Richmond to treat with the government of the Confederate States. No official of that character, sent by the government of the Confederate States to foreign powers was ever recognized and received in that capacity. If Lord John Russell, in speeches before political meetings, spoke hopefully of the Confederate cause; and if now and then, a member of Parliament said in his place that the Confederate States were a government *de facto* and ought to be recognized, it was matter of but little import. Whatever else may have been said or done in England or in France touching these matters, it is certain that no solemn act of either government was ever announced declaring the Confederate government a government *de facto*.

Conceding, however, that the Confederate States were a belligerent power, did that constitute them a government *de facto?* Certainly not. It is contended nevertheless that its *status* was that of a *de facto* government because the insurgent States established a government and exercised jurisdiction over the country which they embraced. In ex-

William D. Smith v. Charles D. Stewart, et als.

amining this proposition, we must look dispassionately at the stern array of facts that come within the field of view.

What then is a government *de facto?*

A government *de facto* arises only where the established government has been subverted by successful rebellion, and the new government exercises undisputed sway for the time being over the entire country; or, where the people of any portion of a country subject to the same government, throw off their allegiance to that government and establish one of their own; and show, not only that they have established a government, but also their ability to maintain it. This principle is founded upon reason and the fitness of things, and is therefore a rule of international law. The recognition of the government of a revolted State or province by a neutral power, is *casus belli* for the sovereign claiming dominion over the revolted country, if such recognition precedes the exhibition by the newly formed government of its ability to maintain its independence. Where recognitions of revolted States have occurred without this manifestation of the ability to sustain their new condition, they have been simply interventions with the intention of war.

During the cruel and fanatical war waged against the Netherlands by Philip the Second of Spain, England recognized their independence for the purpose of becoming a party to the war; fearing that if the Netherlands were subdued, both the government and church of England would be in danger from the power and fanaticism of Philip. What has been the uniform usage of nations on the subject of recognition? Numerous examples might be given. A few will suffice. When in 1778, France entered into treaties of alliance and commerce with the British North American colonies, then in a state of revolution, she adopted these measures upon the express declaration that "the people of these colonies were in the public possession of their independence, and *above all* that their former sovereign had shown by long and painful effort the impossibility of reducing them to obedience."

The uniform course of the United States towards the various provinces of Spain on the American continent, which, from time to time, within the last half century, have been in a state of revolt, has been scrupulously to abstain from the recognition of any of them as *de facto* governments until Spain herself had abandoned the contest, or it became morally certain that her power could never be reinstated.

Now, at what time did the insurrectionary States, in the late unhappy conflict, exhibit to the world their ability to maintain their so called government against the gigantic power of the United States? If they never did this, the claim set up for them as a *de facto* government must fail. Aside from the fact of their inability to maintain the government they set up being proved by the actual failure, it may justly be said that the result of the conflict was apparent from the beginning. What are the facts? The Southern States revolted and established a govern-

ment founded as they declared upon the great principle of slavery, and with the avowed purpose of perpetuating it. They did this in defiance of the moral sentiment of all Christendom. They had, no doubt, the good wishes of the few who yet remain hostile to the march of liberal sentiment, and who cling to the idea of the divine right of kings. But on which side in the fearful strife were the sympathies of the masses of mankind? True, the Confederate States had a constitution, a congress, a president, officers of state; but to what purpose were these things, without the power to uphold them? One-half the population of the revolted States was ready at any moment when the opportunity occurred to rise in opposition to the new government, as all sane men knew it would do. No inconsiderable number of the other half helped also to swell the armies of the Federal government. Spread over an immense extent of country, and occupying at first all the strongholds within the arena of war, the weaker party were enabled to maintain the unequal contest for several years; but was it the less certain how it must terminate? Cut off from all intercourse with foreign countries by a powerful navy, the exhaustion of the country was slow indeed but gradual and certain. A merciless conscription which dragged into the Confederate ranks all the efficient men of the country, was wholly inadequate to supply armies to repel the outnumbering forces that were advancing in every direction. The desertion of the laborers left the fields uncultivated. Without money, without manufactures, and without producers, food, clothing and the munitions of war began to fail. No intervention by any of the powers of Europe was to be expected. The public sentiment of England, in unison with that of the sovereign, restrained the ministry; while the judgment and caution of Napoleon kept him from venturing alone upon a measure by no means free from hazard, in view of his tenure of the throne of France, and of the well defined position of Russia touching intervention by any of the European powers.

In juxtaposition with this state of things, it was seen that upon the white basis the population of the loyal States was more than fourfold that of the Confederate States. From that population the Federal forces were not only continually recruited, but continually increased. Abounding in manufactures of every kind, with producing capacities unexampled in the history of any people; with money and credit commensurate with the exigencies of the crisis, the armies of the Federal government were better clothed, better fed, better armed and better paid, than the same vast number of men going forth to war, have ever been, in ancient or modern days. With these facts glaringly before the eyes of the world, can it be said that the Confederate States at any time exhibited their ability to maintain the government they established?

The advocates of the proposition that the Confederate States were a *de facto* government resort to English history for authorities to support their position. We think they are not fortunate in doing so. During the long continued wars carried on by the rival houses of York and Lancaster, when the kingdom was in turn held by the one or the other of the parties, *de facto* governments were alternately established, because intervals of long duration occurred between these alternate occupations of the crown, and during which all strife had ceased. Such was the case during the usurpation of Cromwell. He was in the undisputed possession of the government for a long period, during which he had no opposition. For this reason the Cromwell government was a *de facto* government; and we do not see that it proves anything that Sir Matthew Hale, an undoubted loyalist, held office under it, and that he afterwards held office under Charles the Second. The words of Lord Hale, quoted with such confidence are very significant on this point. He says: "the right heir of the crown during such time as the usurper is in plenary possession of it, *and no possession thereof in the heir*, is not a king within the act, on the subject of treason." The authority of Sir Michael Foster is also to the same effect. He says: "a king even *de facto* in the full and sole possession of the crown, he is a king within the statute of treason." It is clear that all these examples drawn from English history, and the authorities cited, make good the premises we have laid down. They all show conclusively the conditions to be absolute and plenary possession without interruption; and no possession of the realm in the adverse claimant. It is matter of history that these conditions were not fulfilled in the case of the Confederate government. From a very early period of the contest the Federal occupation of territory within the limits of the Confederate States was gradually extended, until the whole country was occupied, or at least, until the Confederate authority was entirely subverted. We conclude finally that by the principles of international law, and the general usage of nations, the late government of the Confederate States did not attain the status of a government *de facto*. The authority then set up under the government of the late insurgent States was illegal and void. It cannot therefore avail the plaintiff.

*Third.*—The third inquiry is, did the defendant act under compulsion? The evidence sufficiently discloses that he was a willing and ardent soldier in the war against king cotton. We think he rendered willing rather than compulsory service. But it is no where shown by the record that he was actuated by malice or ill feeling against the plaintiff. It is true that he acted in the matter of cotton burning conjointly with the other defendants under a militia officer; but we are rather inclined to think that the militia was a kind of machinery introduced with the view of giving an apparent legalization to the predetermined acts of those who advocated the ruinous policy of destroying cotton. But it is contended that the skirts of the defendant are not free from the flame and smoke of the burning staple. One witness says that the plaintiff set fire to some of his own cotton. It is shown that he caused

William D. Smith v. Charles D. Stewart, et als.

cotton bales to be hauled out from under his gin, to have them in readiness for the cotton burners when they arrived, and that he advocated the burning of cotton. The testimony of the one witness in regard to the plaintiff's burning a part of his own cotton appears to have been disregarded on the trial below; and that portion of the testimony showing that he was in favor of the destruction of cotton to prevent its falling into the hands of the Federals also shows that he held it premature to burn cotton at that time. It is clearly established that when the torch was about to be applied to his cotton, he protested against the act and earnestly requested time to remove it out of the way of the enemy, stating that he expected a boat in a short time by which he intended to send his cotton up the river, far in the interior.

There is another feature in these transactions worthy of notice. The proclamation of Governor Moore directed the burning of all cotton within the limits of the State, which was in danger of falling into the hands of the Federal forces, and provided that where it could be removed out of their reach, that it should be done. This clothed the militia officers with a margin of discretion, which (as they acknowledged the legality of the order) it was their duty to exercise with propriety and judgment. It is not shown by the record that there was danger at all of the capture of cotton by the Federals; on the contrary, it appears that when their vessels of war went up the river, none of the cotton remaining was taken by them! Neither is it shown that at the time the plaintiff's cotton was burned there was immediate and imminent danger of its capture; so that the plaintiff was deprived forcibly of the benefit of the proclamation, which gave him the privilege of removing his cotton if he were able to do so. The party acting under the illegal authority by which defendant seeks to shield himself, certainly appears not to have exercised a sound discretion in their proceedings, carried on as they were, under mistaken zeal and remarkable delusion.

This case was tried in the court below before a jury. The verdict was against the defendant. We find nothing in our review of the case that authorizes us to alter it.

It is therefore ordered, adjudged and decreed that the judgment of the District Court be affirmed with costs.

---

MEMORANDUM OF AUTHORITIES CITED BY E. T. MERRICK ON ARGUMENT—ON REHEARING.

The charge of the Judge is correct and is good law. C. C. 2295, 2296. If it were calculated to mislead, which it is not, still a new trial ought not to be granted because the facts warrant the verdict. Hennen's Dig. pages 97, 99; Nos. 1, 11, 15, 16, 24, 27, 32, 35, 37.

Governor Moore had no authority to authorize any one or *justify* any one in burning the cotton of the people. The Constitution of 1852 under which he was acting gave him no such power. Defendant filed a justification. His warrant fails him. *His answer calls it a rebellion.*

Even a *de facto* government cannot grant away the public domain, much less take the property of citizens for the purpose of opposing the government *de jure.* See Garcia *v.* Hatchell, 8 N. S. 398, 401. 12 Peters 522, Garcia *v.* Lee.

In a lawful government "all instructions from the executive which are not supported by law are illegal, and no inferior court is bound by them." Brightly's (New) United States Digest of Decisions, p. 144. Sec. 86 and cases cited.

Prescription, 4 Sarigney, p. 426, Berlin Ed.

(2) "The *utile tempus* is only applicable to such periods of time which are established by general laws and not those established by the will of individuals as where the Judge has fixed a delay in the progress of a suit."

(3) "The *utile tempus* does not avail in all the cases which we have here mentioned but only where the prescribed period of time is a year or less, never when it has reference to more than a year.

"This rule does not need any proof, for only two prescriptions, a year and one hundred days come under it *and for both it is incontestable.*" See Mackelday, Brussels Ed., p. 102, p. 111. See Stat. at Large, 12 vol. 590, 1262.

*Quia tractabus de utilibus diebus frequens est videamus quid sit experiundi potestatem Rabere.* 1, 44, 3.

"Because it is frequently discussed as to what are *useful days* we will see what is meant by having the power to prosecute one's rights.

It is in the first place necessary that the person shall have the ability to institute a suit *facutus agendi.* It is not sufficient that the *defendant* presents himself, or has some one in the place who shall be capable of defending him; there must not be any cause which prevents the *plaintiff* from instituting his action. *(Nulla ideona causa, impediatur experire).* Thus, if he is a prisoner or with the enemy, or absent on account of the republic, or in bonds *(in vinculis)* or if he is detained in another place, or in another country *(regione)* by bad weather *(tempertate),* so that he can neither come or send a mandate to another to sue for him, he is considered as not having the ability to act *(experiundi potestatem non Rabet).* It is clear that he who is sick, but still able to employ another in his case has the power to act. No one will doubt that a person has not the power of acting who cannot be heard before the pretor. Those days only are considered useful on which the pretor renders justice." Dig. Lex. 1. Lib. 44. Pct. 3.

## ON REHEARING.

LUDELING, C. J. The question to be considered first, is that raised by the plea of prescription.

The acts complained of were committed on the twenty-ninth of April, 1862; the citations in this suit were served on thirteenth and fourteenth of March, 1866. The prescription of one year, barring actions resulting from offenses or *quasi* offenses, had accrued, therefore, unless it was *interrupted* or *suspended.* It is not pretended that there was any interruption of prescription.

But it is alleged that the prescription *was suspended* from the date of the commission of the act which injured the plaintiff, until the fifteenth of June, 1865, by reason of the existence of war and civil commotion in the country, and the impossibility to sue the defendants before the reorganization of the courts, after the cessation of hostilities, and the maxim, "*contra non valentem agere non currit prescriptio,*" is invoked.

The textual provisions of the Civil Code, on the subject, seem plain and unambiguous; and if the question were now presented for the first time for adjudication, there could not be much room for doubting how to determine it. Article 3420 declares, "Prescription is a manner of acquiring property and *discharging debts by the effect of time, and under the conditions* REGULATED BY LAW." Article 3487 declares "Prescription *runs against all persons,* unless they are included in some exception *established by law.*"

The exceptions are enumerated in the Code. The existence of a state of war is not among the exceptions *established by law,* neither is the inability to sue, except in a few instances expressly mentioned. C. C. 2512; 3488 *et seq.*

It is manifest, therefore, that the rule "*contra non valentem agere non currit prescriptio*" is not recognized in the Code, except in cases expressly mentioned.

But, notwithstanding the plain and positive provisions of the Code, our predecessors have, in some instances, recognized the maxim, and under its equitable rule have relieved parties against whom prescription was pleaded. As might have been expected when Judges depart from the plain provisions of written law to decide according to the equity or necessity of each case, conflicting opinions have been the result. And so long as courts continue to act under the notion, that their equity powers authorize them to correct, control, moderate or supersede the law, with the view of enforcing rights which are just, great uncertainty and confusion will ensue; and as Mr. Justice Blackstone says, courts of equity "will rise above all law, either common or statute, and be most arbitrary legislators in every particular case."

In Rabel *v.* Pourciau, it was held that "this court has settled a different jurisprudence in regard to *the proceedings in actions on bills of exchange and notes payable to bearer or order, etc.,* and has held that the maxim '*contra non valentem*' *resting solely on jurisprudence* cannot be applied to such a prescription, *without violating the manifest spirit and intention of express law;* that that prescription running against minors and interdicted persons, thereby indicated the policy of the law maker, *and his intention that it should be strictly enforced.*"

We reiterate that the maxim cannot be applied to suspend the course of prescription against bills of exchange, notes, etc., because it is in opposition to the plain and positive provisions of the Civil Code.

But it is equally a violation of "the manifest spirit and intention of express law," to permit the maxim to apply to the prescription of actions for damages, resulting from offenses and *quasi* offenses.

Article 3506 says: "The prescription mentioned in the preceding article, *and those prescribed above in the first and second paragraphs run against minors and interdicted persons,* reserving, however, to them their recourse against their tutors and curators. *They run also against persons residing out of the State.*"

William D. Smith v. Charles D. Stewart, et als.

The prescription pleaded in this case is mentioned *in the first paragraph* of section third, chapter third of the Civil Code, and therefore, that prescription also "running against minors and persons interdicted," and "persons residing out of the State," it is manifest that the legislators did not intend to permit the application of the maxim to it, any more than to the prescription against bills of exchange, etc.

The rule "*contra non valentem*" is applicable to both classes of cases, or to neither. We think it is not applicable to either. Hatch *v.* Gilmore, 3 An. 510.

Our attention has been called to the opinion of the Supreme Court of the United States in the case of Hanger *v.* Abbott, 6 Wallace, p. 542, in which that august tribunal held, that "the rule of the present day is that debts existing prior to the war, but which made no part of the reasons for undertaking it, remain entire, and *the remedies are revived* with the restoration of peace."

That this *should be* the rule we believe, but that it *is* the rule, we doubt. And we are sustained in our view of the law by the high authority of the Supreme Court of the United States. In McElmoyle *v.* Cohen, 13 Peters 327, the court said: "It would be strange if in the now well understood rights of nations to organize their judicial tribunals according to their notions of policy, it should be conceded to them in every other respect than that of prescribing the time within which suits shall be litigated in their courts. Prescription is a thing of policy, growing out of the experience of its necessity; and the time after which suits or actions shall be barred, has been from remote antiquity fixed by every nation, in virtue of that sovereignty by which it exercises its legislation for all persons and property within its jurisdiction. This being the foundation of the right to pass statutes of prescription or limitation, may not our States, under our system, exercise this right in virtue of their sovereignty?" In McIver *v.* Ragan, 2 Wheaton, p. 28, it was admitted that the case was within the act of limitations of the State of Tennessee, *and not within the letter of the exceptions*, and Chief Justice Marshall, as the organ of the court, said: "Wherever the situation of a party was such as, in the opinion of the Legislature, to furnish a motive for excepting him from the operation of the law, *the Legislature has made the exception. It would be going far for this court to add to those exceptions*."

In the case of the Bank of the State of Alabama *v.* Dalton, reported in 9 Howard, p. 250, the defendant was sued on the very day he moved into the State of Mississippi. The statute of limitations was pleaded in bar of the suit; and the plaintiff insisted that as the laws of Mississippi did not operate on either plaintiff or defendant, nor on the foreign judgment, *until the day on which the suit was brought*, no bar could be interposed, founded on the lapse of time, as none had intervened. Here, it would seem, was a case where there had been no *utile tempus*, and in which the maxim "*contra non valentem agere non currit prescriptio*," might be applied, if courts were at liberty to supply it. Yet neither the Mississippi court, nor the Supreme Court of the United

States, would relieve the plaintiff under that rule. The Supreme Court of the United States held, that "the acts of the Legislature furnish rules of decisions," * * * * "the question *is one of legislative power,* and not of practice." * * *.

"*The act itself makes no exception* in favor of a party suing under the circumstances of these plaintiffs. So the Supreme Court of Mississippi held in the case of McClintock *v.* Rogers; and this is manifestly true on the face of the act. *The Legislature having made no exception,* THE COURTS OF JUSTICE CAN MAKE NONE, *as this would be legislating.*" And after having reaffirmed what was said in McIver *v.* Ragan, already quoted in this opinion, the court declared "*The rule is established beyond controversy.* It was so held by the Supreme Court of New York in Troup *v.* Smith, 20 Johns. 33; and again in Callis *v.* Waddy, by the Court of Appeals' of Virginia, and also in Hamilton *v.* Smith, by the Supreme Court of North Carolina, and in Cocke & Jack *v.* McGinnis, in the Supreme Court of Tennessee. Nor are we aware that, at this time, the reverse is held in any State in this Union. It is the doctrine maintained in Stowell *v.* Zouch, found in Plowden's Reports 353, *and not departed from by the English courts, even in cases of civil war, when the courts of justice were closed, and no suit could be brought.*" "As the act of limitation has no exception that the plaintiff can set up, *and as none can be implied by the courts of justice,* * * * it is our duty to affirm the judgment." 9 How. 250.

And Mr. Marcade commenting on article 2251 of the Napoleon Code, corresponding with article 3487 of our Civil Code, alludes to the great confusion and uncertainty which anciently existed in France on the subject of the suspension of prescription, in consequence of the application by judges and authors of the rule "*contra non valentem,*" and he remarks, "Le Code a porte remede a cet etat de choses, et prevenu tout danger de ce genre pour l'avenir, en declarant formellement, par notre article 2251, que la prescription *court contre toute personne* qui ne peut pas invoguer *une exception establie par la loi.* Ainsi c' est desormais la loi qui sera le seul guide a suivre; les considerations d'equite qui eussent per entrainer aujourd 'hui tel esprit et demain tel autre seront sans valeur; et toutes les fois qu'on se demandera si tel cas, a raison de sa gravite, ne doit pas etre regarde comme mettant a l'abri de la prescription, il ne s'agira, pour repondre, *que de voir si ce cas ventre ou non dans l'une des exceptions posees par le Code.*"

And he concurs with M. Duranton and M. Coins-Delisle in their views that war, pestilence and other cases of *vis major,* are expressly excluded from the causes which suspend prescription, by the terms of the article. Marcade Prescription, p. 150. Rev. de dr. franc. et etrang; 1847, p. 285–302. Duranton, Nos. 285, 286.

So we think. "Prescription *runs against all persons,* unless they are included in some exception *established by law.*" Art. 3487, C. C.

The Legislature of this State might have established an exception to meet the contingencies of this case, but they have not; and though the plaintiff, and those similarly situated, may exclaim, in the language of M. Marcade "*dura lex*, mais il faudra toujours ajouter, *Scripta tamen*."

If our Code has furnished us a rule, it is imperative, even though it be shown to be defective, and grave and weighty considerations of policy are appealed to in favor of another. The remedy is in the hands of the Legislature. 16 La. 394.

This view of the case renders it unnecessary to notice the bill of exceptions taken to the charge of the District Judge; and in other respects the former opinion rendered in this case meets with our approbation.

It is therefore ordered and adjudged, that the decree of this court, rendered on the twenty-fifth of February, 1867, be avoided, that the judgment of the District Court be annulled; and that the verdict of the jury be set aside. It is further decreed that there be judgment in favor of the defendants, and that the plaintiff and appellee pay the costs of both courts.

REPORTER.—The first opinion in this case was pronounced by Mr. Justice Taliaferro of the Supreme Court, organized under the Constitution of 1864, in which the maxim *contra non valentem*, etc., was applied. A rehearing was granted and the case was transferred to the present Supreme Court, organized under the Constitution of 1868. Chief Justice Ludeling confined his review on the rehearing to the plea of prescription, overruling the former decision on that point and thereby reversing the former decree. It may here be noted as an index of the progress of judicial opinion on the question of prescription, that two of the judges of the present court, Messrs. Taliaferro and Howell, were members of the Supreme Court immediately preceding this, both of whom were on the bench at the time the first opinion in this case was pronounced, and both of whom now concur in the new doctrine established on the suspension of prescription.