502 So.2d 1034 (1987)
PLAQUEMINES PARISH COMMISSION COUNCIL
v.
DELTA DEVELOPMENT COMPANY, INC. et al.
No. 86-C-0950.
Supreme Court of Louisiana.
February 23, 1987.
*1035 Jack Pierce Brook, Randall A. Karr, John R. Schupp, Broadhurst, Brook, Mangham & Hardy and Ernest R. Eldred, George L. Clauer, III, David M. Latham, Eldred, Clauer and Davis, APLC, for applicant.
Daniel Lund, Harold Carter, Jr., Francis Accardo, Montgomery, Barnett, et al., J. Minos Simon, Peter Butler, Aubrey B. Hirsch, Heebe & Hirsch, John McCollam, Marcel Garsaud, Jr., Andrew McCollam, III, Gordon, Arata, et al., Gene Lafitte, William Pitts, Ann Tate, Liskow & Lewis, Stephen R. Remsberg, Lemle, Kelleher, et al., Jack M. Wiss, Brent B. Barrier, Phelps, Dunbar, et al., Michael McAlpine, Johnson & McAlpine, for respondent.
*1036 CALOGERO, Justice[*].
In this case, in which the Plaquemines Parish Commission Council seeks to be declared owner of, or to recover, certain mineral interests incident to parish lands from the heirs and donees of Leander H. Perez, Sr. and from Delta Development Co., Inc., a corporation whose stock is now purportedly fully owned by the four children of Perez, we must decide whether the district court and court of appeal were correct in maintaining an exception of ten year liberative prescription.
On August 25, 1983, the Plaquemines Parish Commission Council, as governing authority of Plaquemines Parish, and as successor to and governing authority of the Grand Prairie Levee District and of the Buras Levee District, filed suit against Delta Development Co., Inc.[1] and fourteen named individuals. Those fourteen are heirs and donees of Leander H. Perez, Sr., and his wife, Agnes O. Perez, who are both deceased. The individual defendants can, and for purposes of this opinion, should be grouped separately. The first group consists of Leander H. Perez, Jr. and Chalin O. Perez, who are alleged to have breached their fiduciary duties as public officials. The second group consists of the four children of Leander H. Perez, Sr. and Agnes Perez, namely Leander Perez, Jr., Chalin Perez, Betty Perez Carrere and Joyce Perez Gelpi, each of whom have been recipients of donations inter vivos and have unconditionally accepted the successions of their parents. The third group consists of defendants who have or may have been recipients, by inter vivos donation or otherwise, of any property originally acquired through an alleged breach of fiduciary relationship by Leander Perez, Sr.[2]
In its petition, the Council alleged that the three "public official" Perezes, Leander Perez, Sr., Chalin Perez and Leander Perez, Jr., wrongfully secured and retained personal interests in publicly owned mineral lands through breaches of their fiduciary duties as public officials and as attorneys. More specifically, the petition alleged that:
1) Judge Perez acquired unrecorded and secret overriding royalties in parish minerals through a family owned and controlled corporation, Delta;
2) Judge Perez acquired unrecorded and secret economic interests in parish minerals through the use of interposed parties, *1037 unrecorded documents and secret counter letters;
3) The aforementioned interests were acquired through breaches of fiduciary duties;
4) The two public official sons of Judge Perez engaged in ongoing schemes to keep secret the breaches of duty and to conceal from the public knowledge of their personal gains; and
5) All of the defendants profited and continue to profit from the revenues.
The Council seeks to recover those mineral interests. In particular, the Council seeks "a declaration that it [is] the legal and rightful owner of the mineral interests, delivery of title of those interests from the defendants to [the Council] and an accounting and money judgment for all monies received by defendants attributable to those interests."
The defendants filed, among other pleadings, the peremptory exception of prescription.[3] For the purpose of deciding the exception, the trial court found it unnecessary to consider the merit of the plaintiff's substantive claim. At the hearing the defendants admitted, for purpose of the exception of prescription only, that the mineral interests in question were acquired through breaches of fiduciary duties, and the trial judge and the litigants merely assumed that the manner in which Leander Perez, Sr. acquired the overriding royalties and other interests gave rise to a valid substantive claim on the part of the Council.
The trial court tried the exception on evidence and stipulations. This, of course, was appropriate. However, because of our resolution of the limited issue before us and the legal reasons for that resolution, we place in this opinion more emphasis on the facts in the record before us as they relate to the alleged wrongful acts of Judge Perez. Defendants at the hearing admitted to breaches of fiduciary duty on the part of the "public" Perezes because they felt the alleged breaches were inapposite to the issue of prescription. On the contrary, we find the breaches of duty central to the disposition of the exception of prescription. For this reason, the facts which we recite hereinafter depict in detail those breaches of fiduciary duty.
We do point out, however, that this case has not yet been tried on the merits, so some part of what we recite as facts in this opinion may be subject to contest anew when and if they become important concerning plaintiff's merits claims, at trial hereafter. Furthermore, the merit of plaintiff's cause of action, assuming their allegations are true, is not before us. That legal question, as well as the adequacy of plaintiff's proof in support, will be decided in the future.
The trial court rendered judgment in favor of all the defendants, holding that the Council's suit was a personal action subject to ten years liberative prescription,[4] and that the Council's suit was barred because liberative prescription had commenced to run in 1941 and had run without suspension or interruption, such that the claim now made by the Council prescribed in 1951. The Court of Appeal affirmed, 486 So.2d 129 (1986). The Council then sought writs in this Court. We granted a writ of review, 489 So.2d 909 (1986).
Among the assignments of error presented by the Council is the contention that prescription was suspended or interrupted by the equitable doctrine of contra non valentem agere nulla currit praescriptio.[5] Both lower courts refused to apply the doctrine in the case before us. Because we find the Council and its predecessors were "effectually prevented" from availing themselves of their cause of action *1038 by the affirmative acts of concealment, misrepresentation, legal challenges and fraudulent conduct on the part of Leander Perez, Sr., and the further affirmative concealment on the part of his public official sons who succeeded him, Leander Perez, Jr., and Chalin Perez, we hold the doctrine of contra non valentem is applicable, such that prescription was indeed suspended between 1941 and at least 1980. The exception of prescription was erroneously sustained.

Status and Duties owed by the Public Official Perezes
In order properly to analyze the facts in the record before us, and considering that plaintiff's claims are much delayed assertions against public officials, we feel it important first to emphasize the high degree of trust and confidence placed in public officials by the electorate in this state and nation. We deem it also pertinent to note at the outset, that affirmative as well as negative duties are placed on such public officials, even more especially on those whose public office also imposes a duty which entails legal representation.
In 1919, Leander Perez, Sr. was appointed district court judge of the judicial district which included Plaquemines Parish.[6] He was elected District Attorney of the same judicial district in 1924 and served the Parish continuously as its District Attorney until 1960. In 1954, Judge Perez appointed his son, Leander Perez, Jr., to the position of Assistant District Attorney. In 1960, Perez, Jr., was elected District Attorney, succeeding his father. After that election, Perez, Jr. appointed Perez, Sr. to the position of Assistant District Attorney. Perez, Jr. remained the Plaquemines Parish District Attorney until January 1, 1985.
In 1961 the Plaquemines Parish Charter for Local Self-Government became effective, and Judge Perez was elected, without opposition, to membership on the new Plaquemines Parish governing body, the Plaquemines Parish Commission Council. Judge Perez served as President of the Council and Commissioner of Public Affairs until 1967, when he was replaced by his son, Chalin, who was elected to that same position that year. Chalin Perez served as Commissioner of Public Affairs from 1967 through 1983. The Plaquemines Parish Charter for Local Self-Government placed responsibility for the administration of all Plaquemines Parish public lands in the hands of the Commissioner of Public Affairs.[7]
At all times relevant to this case, 1912 La. Acts No. 125 (codified as amended at La. Rev. Stat. Ann. 16:2 (West 1982 & Supp.1987) and id. 42:261 et seq. (West 1965 & Supp.1987)) named the District Attorney as the sole and exclusive legal advisor to the levee boards, the police jury, and other parish governing authorities within his district. 1912 La. Acts No. 125 expressly prohibited levee boards from using any attorney other than the local District Attorney, unless "real necessity" to do so existed and such necessity was depicted in a resolution promulgated by a given levee board and approved by the Attorney General *1039 and the Governor. The predecessors of the Council, the Grand Prairie and Buras Levee Districts, and the Plaquemines Parish Police Jury, owned and controlled[8] public lands in Plaquemines Parish during Judge Perez's eight successive four year terms as elected District Attorney (1928-1960). Thus, by law, Judge Perez was the statutorily bound "ex-officio" and "regular" attorney for each of these public agencies.
This statutory requirement for a district attorney's representing these public agencies was not changed in any important particular until 1981, when the Legislature added a subsection "D" to La. Rev. Stat. Ann. 16:2, to provide in pertinent part:
Where a parish has adopted a charter for local self government or other home rule charter and such charter provides for the employment of a parish attorney or a special attorney or counsel, the district attorney shall not be the regular attorney or counsel for such governing authority. (Emphasis added.)
The Plaquemines Parish Charter for Local Self-Government did, and does, have a provision that "(t)he Parish Council may employ a parish attorney." Thus, after the effective date of the 1981 amendment to La. Rev. Stat. Ann. 16:2, District Attorney Leander Perez, Jr. was no longer by statute the "regular" attorney for the Plaquemines Parish Commission Council. Accordingly, for more than twenty years following passage of the Plaquemines Home Rule Charter (in 1961) and his becoming district attorney (in 1960), Leander Perez, Jr. was the ex-officio "regular attorney or counsel" for the Plaquemines Parish Police Jury and its successor, the Plaquemines Parish Commission Council. As such, Leander Perez, Jr. was bound in the same attorney-client relationship with the public agency which controlled parish owned mineral lands as his father had been before him.
As duly elected public officials serving their constituencies in Plaquemines Parish, Judge Perez, Leander Perez, Jr., and Chalin Perez were bound to exercise their official functions with the utmost degree of honesty and fidelity. Public officials occupy positions of public trust. Public offices are created for the purpose of effecting the ends for which government has been instituted, which are the protection, safety, prosperity, and happiness of the people; and not the profit, honor, or private interest of any one man, family, or class of men. State v. Maloon, 172 Ohio St. 343, 176 N.E.2d 422, 427 (1961); State v. Sowards, 64 Okl.Cr. 430, 82 P.2d 324 (1938). And, of course, we subscribe to the principle that:
a public officer owes an undivided duty to the public whom he serves and is not permitted to place himself in a position that will subject him to conflicting duties or cause him to act other than for the best interests of the public.
Anderson v. City of Parsons, 209 Kan. 337, 496 P.2d 1333, 1337 (1972).[9] Commenting on the high duty of trust and fidelity owed by public officials, the United States Supreme Court has noted:
The larger interests of public justice will not tolerate, under any circumstances, that a public official shall retain any profit or advantage which he may realize through the acquirement of an interest in conflict with his fidelity as an agent. If he takes any gift, gratuity, or benefit in violation of his duty, or acquires any interest adverse to his principal, without *1040 a full disclosure, it is a betrayal of his trust and a breach of confidence.
United States v. Carter, 217 U.S. 286, 30 S.Ct. 515, 54 L.Ed. 769, 775-776 (1910).
In addition to the duties placed upon them as public officials, Judge Perez and Leander Perez, Jr., owed high duties of fidelity and trust because of the attorney-client relationship which existed between the parish district attorney and his statutory clients, the Grand Prairie and Buras Levee Districts, the Plaquemines Parish Police Jury, and the Plaquemines Parish Commission Council. In no other agency relationship is a greater duty of trust imposed than in that involving an attorney's duty to his client. Parkerson v. Borst, 264 F. 761, 765 (5th Cir.1920); Lupo v. Lupo, 475 So.2d 402 (La.App. 1st Cir.1985); Cattle Farms, Inc. v. Abercrombie, 211 So.2d 354 (La.App. 4th Cir.1968). The relationship between an attorney and his client is one, of necessity, of mutual confidence and trust. Lyons v. Hall, 90 So.2d 519, 520 (La.App. 2d Cir.1956). In situations where the attorney's interest is adverse to that of his client, the attorney's duty requires him to disclose his adverse interest. LeBlanc v. Christina, 19 La.App. 397, 140 So. 149, 151 (1932). In Searcy v. Novo, 188 So. 490 (La.App. 2d Cir.1939), the Second Circuit Court of Appeal further clarified the nature of the attorney-client relationship:
The law leaves no uncertainty in defining the character of duty which an attorney owes to his client. The relation of attorney and client is more than a contract. It superinduces a trust status of the highest order and devolves upon the attorney the imperative duty of dealing with the client only on the basis of the strictest fidelity and honor.
* * * * * *
In advising his client and conducting the latter's affairs, an attorney is bound to exercise that reasonable care and diligence which is usually exercised by lawyers and must possess and employ the ordinary legal knowledge and skill which is common to the members of his profession.... This, however, is not the full extent of a lawyer's duties or obligations to his client; he is, in addition, bound to conduct himself as a fiduciary or trustee occupying the highest position of trust and confidence, so that, in all his relations with his client, it is his duty to exercise and maintain the utmost good faith, honesty, integrity, fairness and fidelity.
Id. at 498-499 (citations omitted). In no relationship is the maxim that "no man can serve two masters" more rigidly enforced than in the attorney-client relationship. Parkerson v. Borst, 264 F. at 765.
The relationship between an attorney and his client, or between a public official and his constituency, is also frequently characterized as a fiduciary relationship. The nature of the fiduciary relationship has been described in the following manner:
The dominant characteristic of a fiduciary relationship is the confidence reposed by one in the other and [a person] occupying such a relationship can not further his own interests and enjoy the fruits of an advantage taken of such a relationship. He must make a full disclosure of all material facts surrounding the transaction that might affect the decision of his principals.
Anderson v. Thacher, 76 Cal.App.2d 50, 172 P.2d 533, 543 (1946).
A fiduciary relationship has been further described as one that exists "when confidence is reposed on one side and there is resulting superiority and influence on the other." Toombs v. Daniels, 361 N.W.2d 801, 809 (Minn.1985) (citations omitted). The duty imposed on a fiduciary embraces the obligation to render a full and fair disclosure to the beneficiary of all facts which materially affect his rights and interests. Hobbs v. Eichler, 164 Cal. App.3d 174, 210 Cal.Rptr. 387, 403-404 (1985) (quoting Neel v. Magana, Olney, Levy, Cathcart and Gelfand, 6 Cal.3d 176, 98 Cal.Rptr. 837, 491 P.2d 421 (1971)). Relative to the duty of disclosure flowing from the fiduciary relationship, the fiduciary's duty to disclose has been held paramount to the beneficiary's duty to investigate possible *1041 conflicts of interest. See E.F. Hutton and Co. v. Brown, 305 F.Supp. 371, 398 (S.D.Tex.1969).
In addition to the duties which arose from their fiduciary relationship with the Plaquemines Parish governing agencies, Judge Perez and his son, Leander Perez, Jr., as lawyers, were affected by an "inherent attribute" of their profession not to represent interests which were in conflict. Brasseaux v. Girouard, 214 So.2d 401 (La. App. 3d Cir.) writ refused, 216 So.2d 307 (La.1968).[10] In 1910, the Louisiana Bar Association (which until 1941 was not an integrated bar) adopted the Canons of Professional Ethics of the American Bar Association. Among the adopted Canons was a Canon 6, concerning "Adverse Influences and Conflicting Interests":
It is the duty of a lawyer at the time of retainer to disclose to the client all the circumstances of his relations to the parties, and any interest in or connection with the controversy, which might influence the client in the selection of counsel.
It is unprofessional to represent conflicting interests, except by express consent of all concerned given after a full disclosure of the facts.
The identical canon was incorporated in Article XIV (Professional Ethics) of the Articles of Incorporation of the Louisiana State Bar Association in 1941.
Having discussed the legal and ethical standards which govern the relationship between public officials and their constituency and between attorneys and their clients, we turn to the facts in this case, as made evident by the record made up at trial of the exception of prescription.

Facts Regarding Acquisition of Mineral Interests
Both the Grand Prairie Levee District and the Buras Levee District had acquired their public lands through acts of the Louisiana Legislature.[11] The overriding mineral royalty interests which are in dispute in this litigation were derived from three leases (base leases), one granted by the Grand Prairie Levee District, and two by the Buras Levee District, to Delta-Louisiana, in 1936 and 1938, respectively. The three leases essentially covered a vast majority of the Plaquemines Parish lands owned and administered by the two boards. As has been noted, when the base leases were granted to Delta, Judge Perez was the District Attorney for the Twenty-Fifth Judicial District, which then consisted of the Parishes of Plaquemines and St. Bernard. As District Attorney, Judge Perez was the ex-officio regular attorney and legal counsel for all levee districts within his judicial district. His judicial district included the Grand Prairie Levee District and the Buras Levee District in Plaquemines Parish.
As has been noted, the lessee in all transactions involving the mineral leases was Delta Development Co., Inc.[12] Delta was formed as a Louisiana corporation in 1934. The initial shareholders noted in Delta's records were Robert J. Lobrano and Robert J. Chauvin (500 shares each) and Harold Sicard (1 share). At the trial of the exceptions, it was stipulated that "on December 20, 1938, par value stock certificates numbered 4, 5, 6 and 7 of Delta-Louisiana were issued to R.J. Chauvin for a total of [495 of 511] outstanding shares for the account of Mrs. L.H. Perez. These certificates replaced no par value stock certificate number *1042 five of Delta-Louisiana, which was then held by Mrs. L.H. Perez."[13]
In 1941, Delta-Louisiana transferred all of its assets to a new Delaware corporation, Delta Development Co., Inc., same name, with its principal office in Bay St. Louis, Mississippi. Mrs. Leander Perez, Sr. received the same percentage of shares in this new corporation.[14] In a further stipulation entered during the trial on the exception, the defendants admitted that all of the previously referred to shares of Delta-Delaware were donated "by Mrs. L.H. Perez in acts joined in by L.H. Perez as her partner in community by acts not contained in the public records but referred to in the records of Delta-Delaware, to their children, L.H. Perez, Jr., Chalin O. Perez, Joyce Perez Eustis, and Betty Perez Carrere by separate acts dated in 1944." The acts of donation were not filed in the Plaquemines Parish Clerk of Court's conveyance records.
On July 20, 1936, the Board of Commissioners of the Grand Prairie Levee District executed a mineral lease in favor of Delta-Louisiana. The Grand Prairie Levee District purportedly received a $300 cash bonus and a 1/8 royalty for granting the lease. The 1/8 royalty was the minimum royalty required to be reserved in connection with a mineral lease by a political subdivision of Louisiana pursuant to 1928 La. Acts No. 66.
Thirty-four days later, on August 24, 1936, Judge Perez, the Board's statutory and exclusive "regular attorney," and Delta-Louisiana, the Board's lessee, entered into an employment agreement for Judge Perez's personal legal services. Pursuant to that employment agreement, Judge Perez was to represent Delta in all matters relating to the Grand Prairie Levee District lease and was to assist Delta-Louisiana in negotiating subleases of that base lease with oil companies. Under the terms of the agreement, Judge Perez was to receive one-half of all cash payments to Delta above $10,000 and any overriding royalty payments above 1/48 which he might negotiate.
This employment agreement, which was not publicly revealed until discovery in this lawsuit, created a clear conflict of interest on the part of Judge Perez. As District Attorney of Plaquemines Parish, Judge Perez was the legal advisor to the Grand Prairie Levee District. Pursuant to his employment agreement, however, he was to represent Delta in all matters relating to Grand Prairie Levee Board-Delta leases, which of course included any disputes which might arise between the levee board and Delta. The existence of the employment agreement aligned Judge Perez with the lessee, Delta (a corporation which was almost fully owned by Judge Perez and his wife),[15] to the detriment of his statutory client, the Grand Prairie Levee District. Judge Perez was by then, if not sooner, *1043 permanently committed to maintaining the Levee Board-Delta leases rather than representing the levee boards with unwavering fidelity and allegiance. There is no indication that Perez ever informed the Levee Board of his connection with Delta Development Company (as stock owner, or contract counsel).
On April 8, 1937, Delta granted its first sublease on Grand Prairie Levee District land to Gulf Refining Company. Under the terms of the sublease, Gulf agreed to pay Delta $500 cash and "other valuable considerations" for the Grand Prairie Levee District sublease. According to a letter introduced into evidence, the "other valuable considerations" included a 1/24 overriding royalty interest reserved by Delta (the difference between levee board's 1/8 and the 1/6 provided in the sublease). By virtue of his contract with Delta, Judge Perez was to receive personally one-half of this 1/24 interest, or 1/48, with Delta receiving the other half, or 1/48. Also, the Clerk of Court's conveyance records purportedly reveal that an additional 1/48 overriding royalty was granted by Gulf to A.S. Cain, Jr., an attorney in the law office of Judge Perez, on that sublease. So, by virtue of the sublease Gulf received a net revenue interest of 39/48 (or 13/16). They had given up 9/48, this consisting of 6/48 (1/8) essentially for transmission through Delta to the levee board (original lessor), 1/48 for Delta and 2/48 for Judge Perez (Perez's 2/48 consisting of 1/48, or half of Delta's 2/48 override under Perez's employment contract with Delta, and the 1/48 Gulf granted to A.S. Cain, Jr.). The overriding royalty interest Gulf assigned to Cain was originally to have gone directly to Judge Perez;[16] however, this was changed so that the interest was in fact conveyed by Gulf to A.S. Cain. Cain then transferred this 1/48 interest to Delta-Louisiana on the same day he received it, and in an unrecorded transaction, a counter letter was then signed by Judge Perez and Delta-Louisiana (by its President, Chauvin). In the counter letter, Delta-Louisiana stated it was holding this additional 1/48 received from Cain, for the account of L.H. Perez, "the true and lawful owner."
Commenting upon the exhibits which indicated a 1/48 overriding royalty interest was initially to go directly to Judge Perez, but was subsequently amended so the interest was conveyed to A.S. Cain, the trial court noted: "Well, it is true, these letters do indicate that for some reason Gulf Refining Company is not conveying the 1/48th overriding royalty interest to Mr. Perez as originally intended. They are conveying it to Mr. A.S. Cain, Jr. which would indicate some concealment on the part of L.H. Perez."
Delta granted its second sublease to Gulf on Grand Prairie Levee District lands on December 15, 1937. As in the previous transactions, Gulf executed a 1/48 overriding royalty agreement in favor of A.S. Cain, Jr. who then assigned those rights to Delta. Through another counter letter, unrecorded, signed by both Judge Perez and Delta-Louisiana's President, Chauvin, Delta-Louisiana acknowledged that this interest was held for Judge Perez, the "true and lawful owner."
On June 11, 1938, the Buras Levee District executed two mineral leases covering a large part of its land holdings on the West Bank of the Mississippi River. The lessee was Delta-Louisiana. The consideration flowing to Buras was $1,500 and a mineral royalty of 1/8, the minimum required by statute. As was the case regarding *1044 the Grand Prairie leases, Delta-Louisiana entered into an employment contract (a second one) with Judge Perez, on October 11, 1938. Judge Perez was to represent Delta-Louisiana generally with regard to the Buras Levee Board leases and to negotiate subleases. Pursuant to the employment agreement, Judge Perez was to receive one-half of any bonuses and advance royalty payments above $20,000 for each sublease. Additionally, Judge Perez was to receive all overriding royalty interests above 1/48.
On December 17, 1938, Judge Perez helped negotiate a sublease of the Buras Levee District lease from Delta to Gulf. Once again, a 1/48 overriding royalty was transferred by Gulf to A.S. Cain, Jr. Cain then assigned the overriding royalty interest to Delta-Louisiana. Delta and Judge Perez then executed another counter letter, unrecorded, which acknowledged that Delta-Louisiana was holding the mineral interest for the convenience of Judge Perez, the "true and lawful owner."
Then, on February 11, 1939, Delta-Louisiana executed another sublease of the Buras Levee District land in favor of Gulf. As had been the case in the preceding transactions, Gulf executed a separate agreement awarding Cain a 1/48 overriding royalty. Cain then assigned that mineral interest to Delta. Judge Perez and Delta-Louisiana executed another counter letter, unrecorded, acknowledging that Judge Perez was the true owner of that 1/48 overriding royalty interest.
Regarding the overriding royalty interests, the parties stipulated as follows:
1) Leander Perez, Sr. acquired overriding royalty interests;
2) The royalty interests were subsequently conveyed by Mr. and Mrs. Perez to the defendants by various inter vivos donations; and
3) The mineral royalty acquisitions and subsequent acts of donation were not filed in the public records of Plaquemines Parish.
Commenting on these agreements, the trial court noted:
The record of this suit contains no evidence which indicates Judge Perez or his sons ever disclosed to the levee boards or the plaintiff his acquisitions of these overriding royalty interests or his connections with Delta. Such interests were later conveyed by Delta to Judge Perez's wife, who donated them to their children and their spouses. Mrs. Gelpi's children and grandchildren inherited their interests from their deceased fathers.
The public records of Plaquemines Parish do not disclose the ownership of Delta's stock, the acquisitions by Judge and Mrs. Perez of the subject 1/48 overriding royalty interests, nor the donations thereof to their children and spouses....
The trial court recognized that the alleged conflicts of interest on the part of the public official Perezes continued for several decades. In its Reasons for Judgment, the trial court noted that miscellaneous unrecorded letters and documents revealed conflicts of interest between Delta and the levee districts where the parties were represented by Judge Perez or his attorney son, Chalin. Such conflicts took place as late as the mid 1960's.[17] According to the *1045 trial court, the conflicts appeared in disputes between Delta and its sublessees, wherein Delta was the recipient of benefits which were not disclosed to the levee boards. In fact, Delta's receipt of benefits was in part as a consequence of the Council's foregoing claim to mineral production, without recompense, a matter urged upon them by Judge Perez, who was one of the Council members at the time.
The scheme initiated by Judge Perez with regard to the overriding royalty interests seems clear. The oil companies were willing to pay more than a 1/8 royalty interest to procure subleases on the Plaquemines Parish lands. Instead of having the additional royalty interest go to his clients, the Grand Prairie and Buras Levee Districts, Judge Perez, by means of his almost fully owned corporation, Delta-Louisiana, and through employment agreements and unrecorded counter letters, diverted the additional interests to himself and his corporation.
For purpose of this exception, breach of fiduciary duty was admitted. A review of *1046 the record clearly indicates the manner in which those breaches of fiduciary duty occurred, even though that was simply stipulated, and the case has not yet been tried on the merits.

Events Occurring After Original Acquisition of Mineral Interests
Notwithstanding the fact that Judge Perez's alleged ownership of at least 97% of the stock in Delta-Louisiana and his personal acquisition of overriding mineral royalties relative to the levee board lands were fully concealed, such that these interests were not to be found in the public records of the parish,[18] he was unable to avoid suspicion of impropriety.[19] During the 1930's and early 1940's, various allegations were made concerning Judge Perez's alleged ownership of Delta-Louisiana and his acquisition of interests in parish mineral lands. Particularly noteworthy were charges made in 1940 by a political opponent, Plaquemines/St. Bernard Parish District Court Judge J. Claude Meraux. Judge Meraux accused Judge Perez of being wrongfully involved in personal acquisitions concerning public mineral lands in the parish.[20] Various newspaper articles chronicled the Meraux and Perez charges and counter charges.
The Council and the defendants maintain different positions as to the effect of these public allegations. As will be discussed infra, we find the allegations inapposite to our decision in this case. Suffice it to say that attentive citizens certainly would have been suspicious of Judge Perez's involvement in the leasing of parish mineral lands as early as 1940.
In 1940, a new administration came to power in Baton Rouge, upon the election of Governor Sam Jones. In that same year, the Louisiana Legislature, in 1940 La. Acts No. 13, created an entity known as the Crime Commission. The act gave the Crime Commission broad authority to investigate the affairs of political subdivisions of the state. Pursuant to the enabling legislation, financing of the Crime Commission was to come from the General Fund of the State Treasury.[21] Evidently, early subjects of inquiry by the Crime Commission were Judge Perez and the Buras and Grand Prairie levee boards' mineral leases to Delta-Louisiana.
On December 11, 1940, Eugene Stanley, Louisiana Attorney General, and a member of the Crime Commission pursuant to 1940 La. Acts No. 13, and J. Bernard Cocke, Orleans Parish District Attorney, filed a Petition for Open Hearing[22] in Criminal District Court for the Parish of Orleans.[23] The Petition alleged that "complaint has been made to them that certain oil, mineral, and trapping leases on lands belonging to public bodies and agencies of the State of Louisiana, in the Parishes of Plaquemines and of St. Bernard, have been procured through fraudulent means by corporations and individuals resident of, domiciled in, or *1047 having their registered office in the Parish of Orleans...." Judge Perez was described in the petition as the attorney for Delta Development Co., Inc. An extensive subpoena duces tecum was served on Delta through Judge Perez. The subpoena duces tecum directed that Delta produce the following documents:
Check book and stubs; canceled checks; Stock book and stubs; mineral leases acquired and executed; Real Estate, mineral and royalty deeds; Moveable property inventory; Bank books, statements and records; Minute books, journals, ledgers, cash books; Papers and correspondence; Accounts Receivable and Accounts Payable; pay rolls; and all other books and papers relative to the business of the corporation.
Instead of removing himself and revealing his interests in mineral royalties affecting the parish's public lands, Judge Perez challenged the subpoenas. He appeared personally and as counsel for Delta, urging a variety of defenses.[24] Throughout the time period in which the open hearing proceedings were pending, Judge Perez refused to respond to the subpoena.
In a motion filed by attorney Fred Middleton on March 5, 1941, it was alleged that he, Middleton, "was and is the only attorney of record for all respondents (including Delta) in the above numbered and entitled proceeding." In the motion, Middleton further requested the court correct its minutes "so as to strike from the minutes ... the insertion in said minutes representing Leander H. Perez as counsel for the respondent corporations (including Delta) in these proceedings." That pleading makes it evident that the levee board's attorney, Perez, although at the same time under contract to represent Delta with respect to mineral subleases, had second thoughts about continuing to represent Delta as counsel of record in that litigation.
Judge Perez and Delta ultimately prevailed in this Court. The motion to quash, denied in the district court, was effectively granted, and the subpoenas were ordered modified "so as to require the production of a reasonable amount of the books and records of the corporation, and the books and records required produced should be particularly described in the writ of subpoena duces tecum." In re Louisiana Coastal Lands, Inc., 197 La. 701, 2 So.2d 184, 188 (1941); Companion case, In re Delta Development Co., 197 La. 712, 2 So.2d 188 (1941).
As the defendants note, modified subpoenas were not thereafter issued, and no further action was taken by the petitioners in those proceedings. A likely reason why no further action was taken was the disablement of the Crime Commission. On December 26, 1940, shortly after the Crime Commission's unsuccessful effort to subpoena Delta-Louisiana's corporate records, and just fifteen days after the open hearing petition was filed, eighty-one concerned citizens, represented by Perez and attorney Fred Middleton, sued the Crime Commission. That attack culminated in Stewart v. Stanley, 199 La. 146, 5 So.2d 531 (1941), wherein this Court held that the Crime Commission was not constitutionally funded.
Thus, by failing to reveal what he should have revealed, by challenging the subpoenas issued to Delta, and by leading a successful attack to deprive the Crime Commission of public funding, Judge Perez avoided revelation of his ownership of Delta-Louisiana and his personal acquisition of overriding mineral interests on levee board lands.
While the open hearing petition was still pending, members of the Grand Prairie and Buras Levee Boards consulted with Attorney General Stanley. Stanley recommended the levee districts hire Messrs. Thomas Furlow and William Blass as special counsel to investigate the mineral affairs and contracts of the respective *1048 boards.[25] Thereafter, in resolutions adopted on September 12th and 16th, respectively, the Buras and Grand Prairie Levee Boards alleged "the interests of Leander H. Perez, District Attorney, individually and as attorney for some of said parties, [were] adverse to the interests of [the levee boards]." The levee boards further resolved to have Furlow and Blass investigate "all contracts and transactions to which this Board was or is a party or on account of which it has paid out money, and all transactions with respect to lands, leases, mineral leases, royalties, rights and interest in which this board has or had any title or right, and in the name and behalf of this Board to institute and prosecute to conclusion any and all suits deemed necessary and proper to recover for this board any lands, leases, mineral leases, royalties, rights, interests, and money to which [they] may be entitled...."
The clear import of the resolutions was that Messrs. Furlow and Blass were to investigate possible improprieties involving the leasing of parish mineral lands, a matter which might have been accomplished but for Judge Perez's reaction to that effort. Charged with an affirmative duty to disclose adverse interests, and knowing that Messrs. Furlow and Blass were to be employed to investigate parish mineral leases from which he benefited, Judge Perez, instead of disclosing his conflicts of interest and removing himself as counsel for the boards, filed suit against Furlow and Blass on October 15, 1941.[26] He sought to enjoin Furlow and Blass from acting as attorneys for the levee boards on the grounds that he, Judge Perez, was the regular statutory attorney for the levee boards. His position, inter alia, was that the boards had failed to allege or prove any "real necessity" to employ special counsel as required by Act 125 of 1912. Notwithstanding Perez's affirmative duty to disclose any adverse interests he may have had, he attempted to divert attention from himself and his own incapacity by alleging in his petition that Furlow and Blass "secured the above alleged illegal (levee board) contracts ... as a result of a conspiracy between them to unlawfully attempt to supplant petitioner as District Attorney and the regular attorney and counsel for said ... levee boards ..." A restraining order was thereupon granted in favor of Perez.
In response to the lawsuit and restraining order, the levee boards, in October, 1941, repealed their earlier resolutions and enacted new resolutions which purportedly clarified their need to retain special counsel. Although the resolutions re-stated that the Board and its statutory attorney had antagonistic interests, the Grand Prairie Levee Board particularly alleged a "real necessity" existed for the employment of special counsel to:
a) recover the Boards' ratable share of severance taxes allocated to the parish, and
b) to nullify certain contracts between the Grand Prairie Levee District and Plaquemines Parish such that the Grand Prairie Levee District could recover lands, leases, royalties and money to which the boards have been deprived by reasons of those contracts.[27] *1049 After the passage of these resolutions, Judge Perez filed a second lawsuit[28] to enjoin the employment of Furlow and Blass pursuant to these October resolutions. The lawsuits, docket Nos. 1703 and 1717 (25th Judicial District Court), necessarily implied (at the least) that Perez, the boards' regular attorney, was capable of representing the levee boards.[29] In neither lawsuit did Judge Perez's pleadings contain admissions consistent with his affirmative duty to disclose conflicts of interest.
In response to Perez's second lawsuit, the Buras, Grand Prairie and Lake Borgne Levee Districts[30] filed three lawsuits against Judge Perez,[31] seeking to enjoin his interference with the employment of the special attorneys. Thus, there were five outstanding lawsuits pending at this point in time. In the first lawsuit,[32] Perez was attempting to enjoin the employment of Furlow and Blass pursuant to the levee boards' September, 1941 resolutions. These September resolutions stated that Perez had interests antagonistic to those of the levee boards such that a real necessity existed to employ Furlow and Blass in order to investigate, inter alia, all mineral leases and royalty payments involving the boards. In the second lawsuit,[33] Perez was attempting to enjoin the employment of Furlow and Blass pursuant to the more narrowly drawn October resolutions which focused on Perez's conflicts in representing the levee boards and their adversary, the police jury. The third, fourth, and fifth lawsuits[34] were attempts by the levee boards to enjoin Judge Perez from interfering with their attempts to employ counsel pursuant to the October resolutions.
All five cases were consolidated for trial. During the trial of the consolidated cases, Judge Perez stated he was ready, willing, and capable of representing the levee boards as their attorney.[35] After hearing all available evidence, the trial court granted exceptions of no right and cause of action in favor of Judge Perez, holding in pertinent part: "No evidence was submitted to justify the employment of these general counsel ..."
Ultimately, this Court, in Board of Commissioners v. Perez, 202 La. 655, 12 So.2d 670 (1943), affirmed the dismissal of the three levee board lawsuits. The opinion was in response to appeals by the levee boards in the three cases wherein the employment of Furlow and Blass, pursuant to the narrower October resolutions, was at issue.[36] Nonetheless, the trial court record (of the five consolidated cases) and Supreme Court briefs in Board of Commissioners v. Perez, id., discussed all five lawsuits and both the September and October resolutions.[37]
*1050 Judge Perez filed both an Original and Supplemental Brief in this Court. In the Supplemental Brief, he quoted from the transcript wherein he had testified (in the five consolidated proceedings) that he was ready, willing, and able to represent the interests of the levee Boards:
I have always stood ready and willing and am capable of representing, these Boards as their attorney; that as testified to by the officers of the Grand Prairie Levee Board, the Buras Levee Board, and the Lake Borgne Levee Board, they have not called upon me for any advice, but they have not notified me or informed me of the date of their meetings.
* * * * * *
Yes, I can represent them; and I would advise them honestly, sincerely, and to the best interest of the Parish of Plaquemines, without compensation, because I am the Ex-Officio, the Attorney of the levee boards of the parish.[38]
Judge Perez's testimony, for certain, and his briefs to the Supreme Court as well,[39] may have constituted fraud upon the Courts. He full well knew that he was not capable of representing the boards with full vigor and undivided loyalty relative to the investigation of levee board-Perez affairs. But for these assertions, and surely if he had performed his affirmative duty to disclose to his client and the Court his personal conflicts of interest, the Boards would have succeeded in 1941 in employing separate counsel. That, in turn, would in all likelihood have facilitated the investigation and assertion of the Boards' claims which are the subject of this litigation.
While the five consolidated suits were being litigated, the Buras Levee Board adopted a third resolution on December 17, 1941. It was this resolution, specifying the suspicions of the boards in particulars which the record in this lawsuit now bears out, which the lower courts relied so heavily upon in their determination that prescription had run.[40]
*1051 On the same day that the Buras Levee District passed this third resolution, two separate taxpayer suits were filed against the Buras and Grand Prairie Levee Districts, seeking to enjoin them from paying any attorneys employed by the levee boards.[41] Through a supplemental and amended petition in Case No. 1734, the plaintiffs asserted that the Buras Levee Board had adopted the December 17th resolution in a "conspiracy" to evade prior restraining orders which prohibited the levee board from violating 1912 La. Acts 125.
At the trial of the cases filed by the taxpayers, Judge Perez, although not a party to the proceedings nor an attorney of record, was present at the hearing, presumably to represent the parish and the police jury. The record and transcript from the previously discussed injunction proceedings [42] were introduced into evidence in the taxpayer suits. This transcript contained Judge Perez's previous misrepresentations in which he stated he was ready, willing, and "capable" of representing the levee boards. These misrepresentations were thus specifically used in the taxpayer's suit in response to the Buras Levee Board's December 17, 1941 resolution (wherein the Board contended Perez wrongfully represented Delta and wrongfully received large payments as a direct result of his conflicting interests).
In the consolidated taxpayer suits, Judge Henry L. Himel, the same trial court judge who had previously ruled against the levee boards, granted a preliminary injunction restraining the Buras Levee District from paying Messrs. Furlow and Blass, or any other attorneys, "... any compensation or expense money under resolutions of employment adopted by the defendant levee board ..." According to Judge Himel, the third resolution adopted by the Buras Levee District (December 17, 1941) was "general", and therefore violated 1912 La. Acts No. 125. The record in the taxpayer suits indicated that counsel for the levee boards moved for a devolutive appeal. For reasons not disclosed in the record before us, the appeal was never perfected.
On March 16, 1942, only four days after the hearing in the consolidated taxpayer lawsuits and prior to the favorable April, 1942, decision in those suits, Perez empaneled a grand jury which returned indictments against various Grand Prairie and Buras levee board members, Attorney General Stanley, and Messrs. Furlow and Blass. Violators of the provisions of 1912 La. Acts No. 125[43] were subject to conviction of a misdemeanor. In case No. 781, Walter Blaize and Earl Hingle (Grand Prairie Levee Board members), and Thomas Furlow were indicted for violating the provisions of this act. In Case No. 782, Paul Galmiche, Julien Cadro, and George Treadaway (Buras Levee Board members), and Thomas Furlow were similarly indicted.
Thereafter Judge Perez secured felony indictments as well. Purportedly acting pursuant to authority granted him by 1940 La. Acts No. 16,[44] Judge Perez secured indictments against Messrs. Walter Blaize, Eugene Stanley, Frank Tatze (Grand Prairie *1052 Levee Board Secretary), and Thomas Furlow, for feloniously conspiring "to defraud" the Buras Levee District. He secured another similar indictment against Eugene Stanley and Thomas Furlow, this time along with Galmiche, Ernest Hingle (Buras Levee Board secretary) and J. Ben Meyer. Given the record now before us, it is fairly clear that Judge Perez employed these criminal charges to secure advantage in his ongoing legal battles with the levee boards and the attorney general. Contained in the record of the captioned criminal proceedings is a lengthy letter to the Attorney General from Richard Dowling, an attorney for the indicted levee board members. In the correspondence, Dowling asked that the Attorney General supersede Judge Perez in the criminal cases. Dowling recited in great detail much of what is in the record now before this Court, and argued that Judge Perez was misusing the inherent power of his office to prevent the levee boards from investigating his own wrongful acts.[45]
The Attorney General, responding to Dowling's correspondence, attempted to supersede Perez in the handling of the criminal cases. Judge Perez fought the attempted supersession. The record does not conclusively show that the Attorney General ever succeeded in superceding Judge Perez. In September of 1944, after Governor Sam Jones had left office, and after Blaize, Earl Hingle, Galmiche, Cadro and Treadaway had apparently been replaced on the levee boards, Judge Perez signed a "Nolle Prosequi" which served to dismiss the foregoing charges against all of the defendants.
Thus, the levee board members, by attempting to investigate Judge Perez's personal interest in the boards' mineral lands, *1053 a matter as to which Perez had an affirmative duty to disclose even in the absence of these attempted investigations, were met with criminal indictments and the threat of imprisonment. These criminal charges were pending for more than two years before they were dismissed during the administration of a new governor.
Defendants contend that Judge Perez was merely doing his duty by prosecuting the defendants. On the contrary, these criminal charges were thinly veiled attempts to discourage further inquiry into Judge Perez's acquisition of mineral interests in public lands.
After this flurry of judicial proceedings in the early 1940's, no similar lawsuits were instituted prior to 1980. Judge Perez and his wife donated their Delta stock to their four children beginning in 1944. In addition, the Perezes donated interests in overriding royalties to the other defendants in this litigation beginning in 1954, it was stipulated. In fact answers to interrogatories filed in the record some months after the exception was tried reveal that the donations by Judge and Mrs. Perez were on the respective dates October 1, 1954, January 1, 1955, October 1, 1958 and January 2, 1959.
Mrs. Perez died in 1967. Judge Perez died in 1969. Their four children accepted both successions unconditionally.
In 1971, John Eustis died. He had been the husband of Judge Perez's daughter, Joyce. In the Judgment of Possession in John Eustis' succession, unspecific reference is made to the Grand Bay Field and the following is noted:
I. Real Estate.
A. Community Property ...
6. Overriding royalty interests acquired by unrecorded instruments dated July 7, 1953 and May 25, 1965.
* * * * * *
B. Separate Property
1. Undivided royalty interests acquired by unrecorded instruments dated October 1, 1954, January 1, 1955, October 1, 1958 and January 2, 1959.

* * * * * *
The defendants contend that, at the latest, these 1971 succession proceedings constituted "notice" to the public of the existence of the overriding royalties acquired by Judge Perez. We disagree. These above mentioned records do not adequately identify the property in question, nor do they give indication that Judge Perez had any connection with these royalty interests. The use of the term "royalty interests acquired by unrecorded instruments" and passing reference to the Grand Bay Field surely represents no such notice. In fact, the use of such vague language in the property descriptions indicates instead an attempt to conceal the true source of the interests.
The defendants also contend that these same succession proceedings constituted "notice" to the Council because Mr. Luke Petrovich, a member of the Plaquemines Parish Commission Council since 1961, was employed as attorney for the Inheritance Tax Collector in Plaquemines Parish when the John Eustis succession was handled in 1971. There is no reason to assume that Petrovich discovered anything more than was recited in the very unspecific reference in the sworn descriptive list and proposed judgment of possession.
In February, 1980, a document was recorded in the Plaquemines Parish Clerk's conveyance records which assigned an overriding mineral royalty interest in a sublease wherein the original lessor was Buras Levee District. That assignment was from Mary Ellen Sheehan Perez, former wife of Chalin Perez, to Nochemco, Inc. The act of assignment purportedly stated that her interest had previously been acquired through Delta, a substituted party for Leander Perez, Sr. This revelation prompted further investigation by the Council, which culminated in this lawsuit.
Notwithstanding the affirmative concealment practiced by Judge Perez, his deception of the courts, his breaches of fiduciary duties, his misrepresentations, the misuse *1054 of his position as district attorney and counsel to the levee boards, and notwithstanding the further affirmative concealment practiced by his sons who were his successors as public officials with similar fiduciary obligations, the lower courts held that the Council's claims had prescribed in 1951 for the reason that the levee boards had "notice" of their claim in 1941; that prescription had not been suspended or interrupted and that the jurisprudential doctrine of contra non valentem agere nulla curret praescriptio, which serves to prevent the running of prescription, was not applicable. We find otherwise, as will be seen in the succeeding portion of this opinion.

CONTRA NON VALENTEM
The district court and the court of appeal found that plaintiff's action to recover the overriding mineral interests in connection with the base mineral leases (and for accounting) based on breaches of fiduciary duties, constituted a personal action subject to a liberative prescription period of ten years. La. Civ. Code Ann. art. 3499 (West Supp.1987), formerly id. art. 3544 (West 1953). They concluded that the ten year period commenced to run in 1941 when it came to the knowledge of the two boards and attorneys Furlow and Blass that Judge Perez may have had an ownership interest in Delta Development Co. and may have been receiving attorney's fees, dividends and other payments as a consequence of the base mineral leases contracted in 1936 and 1938 by the levee boards and Delta.
Upon applying Cartwright v. Chrysler Corp., 255 La. 598, 232 So.2d 285 (1970), and finding that in 1941 the levee boards' causes of action were known, or reasonably knowable, the courts refused to apply the exception of contra non valentem non currit praescriptio. The levee boards were deemed to know what they could by reasonable diligence have learned, and that bars application of the contra non valentem exception to the running of prescription, according to both lower courts.
The levee boards, of course, did have "notice enough to excite attention" so as to put them "on guard and call for inquiry," which under Cartwright "is tantamount to knowledge or notice of everything to which inquiry may lead." Id., 232 So.2d at 287. Cartwright, and similar cases in the modern jurisprudence, generated mostly in the tort area, however, do not concern the three traditional situations in which our earlier jurisprudence has applied the principle, contra non valentem. Cartwright and other of the more recent cases apply contra non valentem where the cause of action is not known or reasonably knowable by the plaintiff, even though plaintiff's ignorance was not induced by the defendant. This constitutes "a fourth type of situation where contra non valentem applies so that prescription does not run." Corsey v. State Department of Corrections, 375 So.2d 1319, 1322 (La.1979)
In this case we have to determine just what principles are applicable in the contra non valentem situation involved here, and more fundamentally, whether contra non valentem continues to be a viable exception to the running of liberative prescription.
This Court in Reynolds v. Batson, 11 La.Ann. 729, 730-731 (1856) set forth the three fact situations in which our early jurisprudence held that the principle contra non valentem applied so as to prevent the running of liberative prescription: (1) Where there was some legal cause which prevented the courts or their officers from taking cognizance of or acting on the plaintiff's action;[46] (2) Where there was some condition coupled with the contract or connected with the proceedings which prevented the creditor from suing or acting;[47] and
*1055 (3) Where the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action.[48]
This jurisprudence developed notwithstanding that La.Civ.Code Ann. art. 3521 (West 1953), a verbatim adaptation of the French Civil Code article 2251, has from at least 1870 (through 1982) provided that: "Prescription runs against all persons, unless they are included in some exception established by law."[49] The doctrine of contra non valentem is of Roman origin[50] and has roots in both the civil and common law.[51] Admittedly, this Court in the latter part of the nineteenth century would have abolished contra non valentem in Louisiana as being contrary to an express provision of the Civil Code, namely La.Civ.Code Ann. art. 3521 (recodified at id. art. 3467). See Smith v. Stewart, 21 La.Ann. 67 (1869); Soulie v. Ranson, 29 La.Ann. 161 (1877); Succession of Winn, 33 La.Ann. 1392 (1881). But Smith, 21 La.Ann. 67, Soulie, 29 La.Ann. 161, and Succession of Winn, 33 La. 1392, were themselves later overruled in Succession of Farmer, 32 La. Ann. 1037 (1880) and McKnight v. Calhoun, 36 La.Ann. 408 (1884), after, though perhaps not because, Smith, 21 La.Ann. 67, was criticized in Levy v. Stewart, 78 U.S. 244, 20 L.Ed. 86 (1871).
Defendants point out that a recent revision of the Civil Code articles dealing with liberative prescription saw La.Civ. Code Ann. art. 3521 superceded by La.Civ. Code Ann. art. 3467, with a change from "prescription runs against all persons, unless they are included in some exception established by law" to "prescription runs against all persons unless exception is established by legislation." They contend that this change heralds a legislative attempt to abolish the doctrine of contra non valentem. The article's revision does not effect such a change. Had the Legislature intended to repudiate contra non valentem they might clearly have attempted to do so. They did not. The official revision comment of La.Civ.Code Ann. art. 3467 as enacted clearly indicates that contra non valentem remains viable after the 1982 recodification of former La.Civ.Code Ann. art. 3521. The Comment reads as follows:
(a) This provision reproduces the substance of Article 3521 of the Louisiana Civil Code of 1870. It does not change the law.
* * * * * *
(d) Despite the clear language of Article 3521 of the Louisiana Civil Code of 1870, courts have, in exceptional circumstances, resorted to the maxim contra non valentem non currit praescriptio. See Corsey v. State Dept. of Corrections, 375 So.2d 1319 (La.1979). This jurisprudence continues to be relevant.
Furthermore, this Court, following the 1983 codal amendment, has continued to recognize the exception. See St. Charles Parish School Board v. GAF Corp., 500 So.2d 405 (La.1987); Crier v. Whitecloud, 486 So.2d 713, aff'd on rehearing, 496 *1056 So.2d 305 (La.1986); Hebert v. Doctors Memorial Hospital, 486 So.2d 717 (La.1986).
The Court majority in Hyman v. Hibernia Bank & Trust Co., 139 La. 411, 71 So. 598 (La.1916) found support for the contra non valentem exception to prescription in the civil and common law generally, in the prior jurisprudence of this state's highest court, and in equity (by specifically citing common law cases applying equity and equitable estoppel). Hyman, 71 So. at 601-602.[52] The concurring Chief Justice, Frank A. Monroe, while not happy with invoking equity, relied upon a universal maxim of justice which holds that "one who fraudulently prevents another from exercising his right of action, can take nothing, under the law by his fraud." Id. at 606. Hyman has been consistently cited, to this day, for the contra non valentem exception to prescription.
There is no question but that contra non valentem continues to be a viable exception to the running of liberative prescription in Louisiana. What chiefly needs addressing here is just what principles are applicable in the contra non valentem situation exemplified by circumstances like those in this case, which falls into what, for simplicity, we will call Batson's third situation (where the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action; more briefly, prevention by the debtor). Reynolds v. Batson, 11 La.Ann. 729.
Defendants would have us determine that both as to the fourth, more modern application of the principle, where the cause of action is not known or reasonably knowable, and the three traditional contra non valentem situations, including prevention by the debtor, contra non valentem is unavailable if the creditor could by reasonable diligence have discovered the facts which might have prompted pursuit of their claims.
But there are significant differences between the known or reasonably knowable circumstance, the fourth situation, and prevention by the debtor, Batson's third situation. As noted by Justice Tate in Corsey, the fourth situation is generically distinguishable from the three earlier or traditional ones. Corsey, 375 So.2d at 1322. In the latter, including prevention by the debtor, the cause of action has accrued, but nevertheless plaintiff is "effectually prevented" from enforcing it by some reason external to his own will, such as conduct of the defendant which prevents him from availing himself of his judicial remedies. In the former, not known nor reasonably knowable, the cause of action does not mature (so prescription does not begin to run) until the claimant discovers or should discover his cause of action. Id. The situations are thus generically different. The governing principles are different, in part, as well. In particular, whether the cause of action is known or reasonably knowable is not alone dispositive in the three traditional situations.
Focusing particularly on Batson's third situation, prevention by the debtor, the cases exemplify this difference. In Nathan v. Carter, 372 So.2d 560, where a defendant "ha[d] concealed ... or ha[d] committed acts (including concealment, fraud, misrepresentation or other ill practices) which tend[ed] to hinder, impede or prevent the plaintiff from asserting his cause of action," the plaintiff's executive officer tort claim for wrongful death and the availability of timely suit were amply evident to her. However, after noting the plaintiff had been induced not to file suit timely by the claims manager's acts of fraud and misrepresentation, we held contra non valentem was applicable because the foregoing acts constituted "acts of fraud and misrepresentation intentionally committed by defendants (or their representative) designed to hinder, impede or prevent plaintiffs from asserting their cause of action or lull them into a false *1057 sense of security." Nathan, 372 So.2d at 563.
The injury to the plaintiff inmate in Corsey (admittedly an unusual case) was more than reasonably knowable. It was in fact apparent: "The damage was immediately discernible to a person of ordinary diligence and capacity," Corsey, 375 So.2d at 1323. Yet contra non valentem was held applicable because "defendant's own tort ... produced plaintiff's mental and physical inability to file suit during the period of tort-caused incompetency." Id.
The same can be said concerning Batson's first and second situations. Contra non valentem was applied, notwithstanding the claims were at all times known, in Quierry's Executor v. Faussier's Executor, 4 Mart. (o.s.) 609 (La.1817) where, prompted by wartime conditions, the Legislature suspended the filing of lawsuits (i.e., some legal cause prevented the courts from acting on plaintiff's action). Contra non valentem was also applied, notwithstanding knowledge, in Dalton v. Plumbers and Steamfitters Local 60, 240 La. 246, 122 So.2d 88 (1960), where the constitution and by-laws of the plaintiff's labor union required exhaustion of his appeal to the union's General Executive Board, before resorting to litigation (i.e., there was a condition coupled with the contract which prevented the creditor from suing or acting).
There are, admittedly, cases in the jurisprudence which, in referring to the third contra non valentem situation, prevention by the debtor, have said that when a party by fraud or concealment prevents another from obtaining knowledge of a cause of action, prescription will begin to run only from the time the cause of action is discovered or might have been discovered by the exercise of reasonable diligence. See, Ayres v. New York Life Insurance Co., 219 La. 945, 54 So.2d 409 (1951); Arkansas Natural Gas Co. v. Sartor, 78 F.2d 924 (5th Cir.1935). None of these cases, however, involved a situation where there was a continuing, on-going fiduciary relationship involving public officials, as in this case, and successful opposition to the principal by its very same public official-statutory attorney agent. Further, as we noted in Corsey, 375 So.2d at 1322, n. 8, use of the foregoing language in the jurisprudence "describes the usual factual situations in which the exception to prescription is applied; but it does not attempt to overrule decisions relating to other generic situations to which the doctrine has uniformly been held to be applicable."
What is most apparent from the jurisprudence is that principles of equity and justice form the basic underpinnings of the doctrine of contra non valentem in both the common law and the civil law. Nathan, 372 So.2d at 563.
The jurisprudence is sprinkled with cases which have applied contra non valentem where there has been "prevention" by the debtor, a reason external to the will of the creditor. See Nathan, 372 So.2d 560; Corsey, 375 So.2d 1319; Martin v. Jennings, 10 La. Ann. 553 (La.1855); Boyle v. Mann, 4 La. Ann. 170 (1849). In each of the foregoing cases, that the causes of action were known or reasonably knowableand they werewas not controlling. The pertinent inquiry was whether the debtor himself had done some act or acts to prevent the creditor from availing himself of his cause of action. If he had, and where equity, justice and fairness demanded it, the doctrine of contra non valentem was applied as a bar to liberative prescription.
This case presents a situation with probably more compelling considerations of equity, justice and fairness than any which can be found in the jurisprudence. Here, prescription is being urged against the lawsuit of a political subdivision by defendants who, while having an affirmative fiduciary duty to serve that political subdivision, have actively concealed, rather than divulged, the true facts. And this concealment followed Judge Perez's having successfully fought the levee boards, his clients, to prevent their discovering the facts and pursuing their claims.
Judge Perez, in 1941 and 1942, prevented the levee boards, admittedly suspicious, from learning with certainty of his hidden *1058 interests, from discovering the particulars of his acquisition of mineral interests, and from pursuing their investigation. No documents were ever recorded, until 1980, which lent evidence of the transactions which took place in 1936 and 1938, and thereafter, by which Judge Perez acquired his mineral interests.
When challenged by his clients he fought them and succeeded in preventing discovery and pursuit. One judgment which he won in the Louisiana Supreme Court was premised on a record wherein he affirmatively misled the levee boards and the courts by stating he was "capable" of representing the levee boards' interests. In essence, he denied that he had any conflict of interest. His response to the boards, for which as district attorney he was legal counsel, upon their trying to hire outside attorneys, was to secure felony and misdemeanor indictments of their members, indictments which remained pending for over two years and apparently until after they had been replaced on the levee boards. He prevented the disclosure of Delta's records (which would likely have shown that his wife was the registered owner of over 97% of that corporation's stock). In proceedings brought in Orleans Criminal District Court, he refused to respond to subpoenas demanding corporate documents of Delta-Louisiana, and he caused abolition of the inquiring Louisiana Crime Commission by successfully challenging its funding by the state. Stewart v. Stanley, 190 La. 146, 5 So.2d 531 (1942). His lawsuits resulted in court decisions barring the hiring of independent counsel by his clients. Had Judge Perez disclosed the Delta-Louisiana stock certificates, his employment agreements with Delta, and the counter letters, all now evident in the record before us, as was his affirmative duty, the results in the earlier lawsuits would surely have been different.
From 1936 through 1960, when he was succeeded as district attorney by his son, Leander Perez, Jr., Judge Perez continuously represented the boards and the board's successor, the Plaquemines Parish Police Jury, as their statutory "regular" attorney. At no time did he divulge to his clients the information which would have served their interest and likely prompted assertion of their claims. From 1961 until 1967 Judge Perez served as president of the Plaquemines Parish Commission Council and Commissioner of Public Affairs. As Commissioner of Public Affairs, Judge Perez's responsibilities included the administration of public lands, the very lands on which he held mineral interests.
From 1960 through at least 1981, when the statute was changed which had made the district attorney the Council's attorney, Leander Perez, Jr. represented the Council and at no time divulged to his clients the information which would have served their interest and likely prompted assertion of their claims.
From 1967 through 1983, after succeeding his father, Chalin Perez served as Commissioner of Public Affairs. During that period he was charged with administering the same parish lands on which he and his family had overriding mineral interests. At no time, at the least at no time prior to 1980, did Chalin Perez divulge to the Council or to the public, information which would have served the Council's interest and likely prompted assertion of their claim.
Defendants argue, however, that after Judge Perez's court victories in the early 1940's there were no proven affirmative acts which prevented the boards, later the police jury, then the Council, from suing or otherwise pursuing their claims. Rather, there was only defendants' failure to divulge to their clients/principals the information concerning ownership of the overriding mineral interests.[53] The public agencies they represented or the public *1059 they served could have acted, say the defendants. There were statutes which the boards and police jury might have employed.[54]
Of course, it is true that La. Rev. Stat. Ann. § 13:4861 (West 1968) afforded public agencies like the levee boards, the police jury and the Council "a right of action for discovery and investigation" when it alleges it has a right of action against a defendant in excess of $500. But that right could only be exercised by appearance in Court with the aid of an attorney. In normal situations, corporations and public agencies (as well as other legal entities) act in court through attorney representatives. See Community Chest v. Union Mission Association, 30 So.2d 131 (La.App. 2d Cir.1947); Southern Sawmill Co. v. Ducote, 120 La. 1052, 46 So 20 (1908); Donovan v. Road Rangers Country Junction, Inc., 736 F.2d 1004, 1005 (5th Cir.1984). And the attorney for the levee boards, police jury and Council during all pertinent times was either Leander Perez, Sr. or Leander Perez, Jr.
Admittedly it was not impossible for the levee boards to hire outside counsel. 1912 La. Acts No. 125 remained on the books. But the "special necessity" in order to do so as required by the statute was essentially no different than what was asserted in the levee boards' unsuccessful lawsuits in the early 1940's. The members of the various levee boards, the police jury and the Council (and, of course, over a forty year span the composition of the membership of these bodies changed continuously) can hardly be faulted for accepting what they probably perceived to be a final judicial resolution favorable to Judge Perez.
In all events, the appointed and elected officials who served on the levee boards, police jury and Council were entitled to rely upon their attorney, who as a matter of fact, owed them a duty to divulge facts in their interest. The very nature of the fiduciary relationship militates against holding principals to an exacting standard of diligence. In fiduciary relationships, principals imbue their agents with a high degree of trust and confidence. The trust placed in the agent gives that agent opportunity to take unfair advantage of his principal. A fiduciary is expected, indeed he is bound, not to breach that trust. Thus, facts which appear suspicious in an ordinary business transaction may not incite suspicion when a relationship of trust exists. If suspicions are aroused, and the fiduciary quiets the suspicions through a misrepresentation of facts, deception, or affirmative concealment, the principal is entitled to rely upon the fiduciary. Where no relationship of trust exists, on the other hand, a person may not rely on the silence of his adversary.
Affirmative concealment in the face of a duty to disclose created by a relationship of trust amounts to "ill practices" at best, and fraud at worst. Such concealment is not an isolated event, but constitutes continuous wrongful conduct which exists, as in this case, throughout the period that the fiduciary relationship exists.
Two court of appeal cases which have considered contra non valentem in the context of an attorney-client trust relationship are Elzy v. ABC Insurance Co., 472 So.2d 205, 208 (La.App. 4th Cir.), writ denied, 475 So.2d 361 (La.1985), and Jackson v. Zito, 314 So.2d 401 (La.App. 1st Cir.), writ denied, 320 So.2d 551, 553 (La.1975); Rev'd in part on other grounds, Cherokee Restaurant, Inc. v. Pierson, 428 So.2d 995, 999 (La.App. 1st Cir.1983). In Elzy, the court noted the doctrine of contra non valentem "may well be applicable where a lawyer has concealed his fault from the client or has otherwise prevented the client from bringing suit." Elzy, 472 So.2d at *1060 208. In Jackson the First Circuit noted that mere silence in the face of a fiduciary duty amounts to "effectual prevention":
The factors enunciated in Hyman and Reynolds, supra, are applicable a fortiori to the fiduciary relationship which exists between an attorney and his client. Contrary to plaintiff's contention, an attorney who remains silent when prescription has run against his client would, in light of his fiduciary duty to said client, be guilty of an act which effectually prevented the client from availing himself of his action against said attorney. As per Hyman and Reynolds, supra, the client could therefore invoke the doctrine to suspend the running of prescription.
314 So.2d at 406-407.
There is simply no comparison between plaintiff's and its predecessor's delay in pursuing their claim, considering their serious, but unsuccessful legal efforts in the early 1940's, coupled with continuous representation of these plaintiffs by the defendant public officials through 1981 and beyond, on the one hand, and the same public officials' continuing breach of fiduciary duty over this period of time, on the other.
Contra non valentem, as a legal reason, or excuse, for not filing suit within a prescriptive period, surely was created for just such a situation as prevailed here. As the concurring Chief Justice Monroe said in Hyman, in explaining why the majority there by continuing contra non valentem as a viable exception to prescription, did not introduce into our law any new exception: "No law was ever enacted which contemplated the defeat of its purpose by fraud, and no court was ever organized which would knowingly permit a litigant to profit by his own wrong." 71 So. at 606.
The defendant public officials and their now deceased father have engaged in active and passive conduct "effectually" to prevent their principal, the Council, and its predecessor political subdivisions, from availing themselves of their cause of action. Justice, equity and fairness demand that they not be allowed to assert that their principal's failure to pursue the claim has caused it to prescribe.
Hyman's resort to equity and equitable estoppel underlies contra non valentem, the jurisprudential exception to prescription. Those principles apply here. Contra non valentem is thus applicable. Prescription against plaintiff's claim was suspended at the least from 1940 until 1980. Plaintiffs' 1983 lawsuit was not time barred.

Prescription and the Defendants Other Than Leander Perez, Jr. and Chalin Perez
We turn now to the exception of prescription filed by Delta Development Co., Inc. The facts which are evident in the present record concerning Delta have been discussed earlier in this opinion. The Louisiana corporation was formed in 1934. Before December 20, 1938 Judge Perez and his wife Agnes, as to whom a community of acquets and gains existed, owned 97% or more of the stock, the particular date of acquisition not being shown in this record. On December 20, 1938 for certain, they did without question own more than 97% (495 of 511 shares) of that stock. When in 1941 Delta-Delaware was formed and became the successor to Delta-Louisiana, Agnez Perez and Judge Perez owned the same 97% (495 of 511 shares) of that corporation.
Plaintiff's allegations in the petition relative to its cause of action, accepted, or assumed to be true by the parties for purpose of trial of the exception of prescription, recited that Delta-Louisiana and Delta-Delaware were "substituted parties for the convenience of Leander H. Perez." By use of that vehicle, as plaintiff's asserted claim goes, mineral interests which would have gone to the Judge's principals, his clients the Grand Prairie Levee District and Buras Levee District, had he been a faithful and conscientious fiduciary, instead went to the Judge and his "substituted" party or alter-ego, Delta.
In 1944, Judge Perez and his wife, by notarial acts which were not then nor ever *1061 recorded (unless perhaps after this lawsuit was filed), donated all of their stock in Delta-Delaware to their four children. The actual stock interest in that corporation by other persons, if any, is not clearly shown in this record, although 16 of 511 shares were apparently outstanding in the names of others in 1938. Plaintiff's 1983 petition, however, alleged that all of the stock in Delta Development Co., Inc. was owned by the four children of Judge Perez, "directly or indirectly" in 1980.
Delta Development Co., Inc. has been represented between 1936 and 1980 by the attorneys Leander Perez, Sr. and Chalin Perez.[55] Until 1944, Judge Perez and his wife Agnes were practically the exclusive stockholders in Delta. From 1944 through the present, apparently, Leander Perez, Jr. and Chalin Perez have been two of the four major stockholders in Delta Development Co., Inc.[56] And, as earlier discussed in greater detail, from 1936, at least, until the early 1980's, Leander Perez, Sr., Leander Perez, Jr. and Chalin Perez, during lengthy, continuous and uninterrupted periods, have been public official fiduciaries representing the political subdivision whose public lands have generated monetary profits for Delta, for Judge Perez personally, and for the Perez family (Judge Perez's donees).
For purpose of prescription and the excusing principle contra non valentem, over the years Delta Development Co., Inc., as to its interests and by virtue of its stock ownership, has hardly been distinguishable from Leander Perez, Sr., his wife, and their four children, two of them his successors as public officials, and all four of them 1944 donees of their parent's stock in the corporation.[57] For all intents and purposes, as to the exception now before us, Judge Perez was Delta. Delta was a direct beneficiary of the personal conduct preceding 1944 of its representative and almost exclusive stockholder (in community), Leander H. Perez, Sr. His apparent breaches of fiduciary duty (to the Council and its predecessors) caused creation of the corporation's mineral interests and his acts effectually prevented pursuit by the Council of its claim. So, too, was Delta apparently a beneficiary, relative to the compromises in the mid 1960's (see supra note 17), of similar conduct on the part of Council President L.H. Perez, Sr., District Attorney L.H. Perez, Jr. and Delta attorney (later Council President), Chalin Perez, when the latter two, Leander Perez, Jr. and Chalin Perez were representatives of and two of the four major stockholders in, Delta Development Co., Inc. As a consequence, and because, given the unique facts of this case before us, the corporation should be charged with the conduct of Judge Perez, Leander Perez, Jr. and Chalin Perez, and for the reasons expressed in an earlier section of this opinion, contra non valentem as an exception to the running of ten year liberative prescription is also applicable to plaintiff's claim against Delta Development Co., Inc.[58]
We consider now the matter of liberative prescription and the claims of the Council as they relate to the eleven defendants other than Leander Perez, Jr., Chalin Perez and Delta Development Co., Inc. The names of these eleven defendants appear *1062 at the outset of this opinion. They are all close relatives of Leander Perez, Sr. They include two daughters, the present wives of his two sons, the present husbands of his two daughters, three grandchildren, and two great-grandchildren. An original defendant, Mary Ellen Sheehan Perez, against whom the suit has been dismissed by agreement, was the first wife of Chalin Perez.
The interests of the daughters, Joyce Perez Gelpi and Betty Perez Carrere were acquired, it was stipulated, by inter vivos donations from Judge Perez. They were also heirs to their parents' successions; however, the record does not reflect whether by that means they received any mineral interests in parish lands. The interests of the other defendants discussed in this section of the opinion were acquired by inter vivos donations from Judge Perez or, as in the case of the grandchildren and great-grandchildren, by inheritance from the deceased donee John Douglas Eustis and the latter's deceased son, John Douglas Eustis, Jr., respectively.[59]
Counsel contend that whatever the present viability of plaintiff's claims against Leander Perez, Jr., Chalin Perez and Delta Development Co., Inc., claims against these eleven defendants have prescribed. They were not public officials or attorneys; and they, each one of them personally, had no fiduciary duty as regards the Council and its predecessor political subdivisions.
However separate and distinct the plaintiff's claims against each of the fourteen defendants may be, all of those claims derive from the conduct and acquisitions of a single individual, Leander Perez, Sr. As regards knowledge, discovery and pursuit of their claims by the Council, there are no differences in plaintiff's claims. Plaintiff was, we have found, effectually prevented by Leander Perez, Sr., Leander Perez, Jr. and Chalin Perez from asserting the claims to the property taken and passed on by Leander Perez, Sr.
To except these eleven defendants from our ruling on prescription in this case, we would have to find differences in the claims as relates to the prevention exception to prescription; and essentially there are none. For one thing, all of these defendants are heirs, donees, or successors of Leander Perez, Sr., who received the mineral interests which are at issue in this case by virtue of breach of fiduciary duty. They are not good faith purchasers for value. All of Judge Perez's donees, contrary to what would normally be expected, desisted from recording the instruments by which they acquired their royalty interests.[60] That conduct, which served to conceal the transfer of the mineral interests and the identities of the persons to whom Judge Perez transmitted those interests, constituted in a real sense acts of prevention, and setting aside for the moment the fact that the donations were not recorded in the Clerk's office, there is no showing in the record that the Council knew or reasonably should have known that these eleven defendants were recipients (nor when) of part of the same mineral interests now claimed by the Council. Each of these defendants benefitted by the conduct of Judge Perez, Leander Perez, Jr. and Chalin Perez in their concealing from their clients/principals knowledge concerning *1063 the outset and subsequent sources of the mineral interests, and in their breaching fiduciary duties. These defendants' adversary, the Council, over the entire period during which the donees enjoyed ownership and retention of mineral interests, was impaired in their opportunity to sue by the fact that the Council was represented legally by the donor and later by the family member/lawyer/public official successors to their donor, and by the fact that from no fault on plaintiff's part, the identity of these defendants was not discoverable from the conveyance records.
Under these circumstances contra non valentem as an exception to liberative prescription is also applicable as regards the claim of the Council against these eleven named defendants.
The ruling of the district courts maintaining the peremptory exception of ten years liberative prescription and the judgment of the Court of Appeal affirming that ruling will therefore be reversed.

Decree
For the foregoing reasons the judgments of the district court and the court of appeal are reversed. The exceptions of ten years liberative prescription filed by the defendants are overruled; and the case is remanded to the district court for further proceedings.
JUDGMENTS OF THE DISTRICT COURT AND THE COURT OF APPEAL REVERSED; REMANDED TO DISTRICT COURT.
DENNIS, J., concurs with reasons.
DENNIS, Justice, concurring.
I respectfully concur.
I join the majority opinion with respect to its decision that the plaintiff's cause of action against Leander H. Perez, Jr., Chalin O. Perez and Delta Development Company has not prescribed. However, as to the other defendants, I have doubts as to whether there is warrant in the record or a justification in the law for finding that a cause of action has been alleged against them or for invoking contra non valentem against them. Therefore, as to these defendants, I would simply set aside the judge's ruling and refer the exception to the merits.
NOTES
[*] Judge Pike Hall, Jr., of the Court of Appeal, Second Circuit participated in this case as Justice pro tempore in place of Justice Watson, recused.
[1] Delta Development Co., Inc. is a Delaware corporation whose stock is either wholly or mostly owned by the four children of the Leander Perez, Sr., and Agnes Octavia Chalin Perez, both deceased. (For further particulars relative to the stock ownership see infra note 13.) The four are Leander H. Perez, Jr., Chalin O. Perez, Betty P. Carrere and Joyce P. Gelpi. Delta is the successor to a Louisiana corporation with the same name. When the circumstances require, the defendant corporation may be referred to as "Delta-Delaware" or "Delta-Louisiana." Where no distinction need be made, the corporation will be referred to as "Delta."
[2] These defendants include: Mary Ellen Sheehan Perez, former wife of Chalin Perez; Lynn Perkins Perez, present wife of Chalin Perez; Aphra Perez, wife of Leander Perez, Jr.; Chester Gelpi, husband of Joyce Perez Gelpi; Richard Carrere, husband of Betty Perez Carrere; Thomas Perez Eustis, Flora Ann Eustis, and Geoffrey Edward Eustis, children of Joyce Perez Gelpi and her now deceased first husband, John Douglas Eustis; Margaret Miller Eustis, former wife of a fourth child of John Douglas Eustis and Joyce Perez Gelpi, one John Douglas Eustis, Jr., now deceased, (Margaret Miller Eustis has been sued individually and as the tutrix or trustee for Jessica Dore Eustis, minor child of John Douglas Eustis, Jr.); and Nancy Eustis Kerr, a divorced wife of John Douglas Eustis, Jr., deceased (Nancy Eustis Kerr was sued in her capacity as tutrix or trustee for Katherine Victoria Eustis, minor child of John Douglas Eustis, Jr.).

Thomas Perez Eustis, Flora Ann Eustis, and Geoffrey Edward Eustis are grandchildren of L.H. Perez, Sr. and his wife, and children of the deceased John Douglas Eustis, Sr. and Joyce Perez Gelpi. They inherited mineral interests which are involved in this litigation from their father, John Douglas Eustis, Sr., interests which had been donated to Eustis, Sr. by L.H. Perez, Sr. and his wife. However, the greater part of the interests of these three defendants were apparently received through inter vivos donation directly from L.H. Perez, Sr. and his wife in 1954, 1955, 1958, and 1959, according to Answers to Interrogatories filed in the record of this litigation.
[3] However, one defendant, Mary Ellen Sheehan Perez, the former wife of Chalin Perez, settled with the Council after the lawsuit was filed. She conveyed to the Council all of her interest in the overriding royalties.
[4] La. Civ. Code Ann. art. 3499 (West Supp. 1987) (formerly id. art. 3544 (West 1953)).
[5] Taken literally, this Latin phrase means that prescription does not run against one unable to act.
[6] In the 1913 Louisiana Constitution, the parishes of St. Bernard and Plaquemines comprised the 29th Judicial District. The two parishes comprised the 25th Judicial District in the 1921 constitution. In 1975, the Legislature created a 34th Judicial District comprised of St. Bernard Parish alone, leaving Plaquemines Parish as the sole parish within the present 25th Judicial District.
[7] The Charter reads, in pertinent part:

The Commissioner of Public Affairs shall be the executive head of the Department of Public Affairs, and as such, shall have jurisdiction over public levees and drainage, and all public property of the Parish, and of the other political subdivisions and districts therein, of which the Parish Council is the governing body, except public buildings and other parish property placed under the control of other Commissioners in this Charter, or as provided by ordinance of the Parish Council. He shall be a member and ex-officio chairman of any parish advisory planning commission appointed by the Parish Council; and he shall have supervision over the parish engineer.
As will be discussed further infra, some of the public land under the administration of the Commissioner of Public Affairs included the parish land in which Judge Perez and his family allegedly held mineral interests.
[8] Control, if not ownership of the parish mineral lands vested in the boards until 1947 and 1948, when by virtue of Act 164 of 1932, and following resolutions, such control passed to the Plaquemines Parish Police Jury, which became the governing authority of the Grand Prairie Levee District and the Buras Levee District.

After the adoption of the Plaquemines Parish Charter for Local Self-Government in 1961, control over parish mineral lands was passed from the Police Jury to the Council, who succeeded the Police Jury as governing authority of Plaquemines Parish and as governing authority over the two levee boards.
[9] Law enforcement officials have furthermore been held to a higher responsibility than mere compliance with the law. State v. State Fish and Game Commission, 139 Mont. 384, 365 P.2d 942, 948 (1961).
[10] Leander Perez, Jr. was admitted to the Louisiana bar in 1950. Chalin Perez was also a lawyer, and was admitted to the Louisiana bar in 1948. The record does not clearly establish whether prior to his election in 1967 he represented as a lawyer either the Plaquemines Parish Commission Council or the Plaquemines Parish Police Jury, although the record does fairly indicate that he practiced law in the office of, and with his father, Leander H. Perez, Sr., who was successively statutory attorney for the boards and parish council president/administrator of public lands for the parish. Chalin's duty to the parish unquestionably arose by virtue of his being the elected Commissioner of Public Affairs (1967-1983).
[11] See 1894 La.Acts No. 18 and 1898 La.Acts No. 24.
[12] In its petition, the Council alleges that Delta-Louisiana and Delta-Delaware were substituted parties for the convenience of Judge Perez.
[13] The exact date of the acquisition by Mrs. Perez of that prior Certificate No. 5 is not known. Apparently, documented evidence of Mrs. Perez' acquisition of stock Certificate No. 5 was lost or destroyed, or was otherwise undiscovered. In any event it was not introduced at the trial of the exception.

Because the record is unclear it is not evident just what happened to Lobrano's 500 original shares or Sicard's one share; nor just how the total shares in Delta came to be 511, if that was the case. (Plaintiff in brief says that the corporation re-acquired 490 of Lobrano's 500 shares.) It appears from the stipulation, however, that as of December 20, 1938 there were only 511 shares of stock in the corporation, of which 495 were owned by Mrs. L.H. Perez. It should be noted, however, that plaintiff's petition alleges that the four children of Judge and Mrs. Perez owned all of the stock in Delta in 1980, either "directly or indirectly."
[14] In the same stipulation alluded to infra, the parties agreed that 495 of 511 shares of Delta-Louisiana stock "were re-issued as [495 of 511] shares of Delta-Delaware.... to R.J. Chauvin, who on the same date [August 20, 1941] assigned the same to Mrs. L.H. Perez."
[15] As noted hereinabove, while Mrs. Perez' original stock certificate (No. 5), community property, was acquired before December 20, 1938 (see supra note 13), the record does not clearly show that Perez or his wife owned stock in Delta Development Company on August 24, 1936, when his employment agreement with Delta was executed, although it is almost certain that they did.
[16] Exhibits P 69, 70 and 71. In a letter from Douglas Lanier to C.A. Lomax (both men were employed by Gulf) dated April 5, 1937, Lanier enclosed "[an] overriding royalty contract in favor of ... Delta ... and a like instrument in favor of L.H. Perez, the former being for a 1/24 overriding royalty, and the latter for a 1/48th." On May 19, 1937, Mr. Lanier again wrote to Mr. Lomax, stating "In accordance with your request, I am enclosing ... overriding royalty contract executed by Gulf ... conveying to A.S. Cain, Jr.... instead of conveying these royalties to L.H. Perez as originally written." (emphasis supplied). On June 1, 1937 Mr. Lomax wrote back to Lanier, and stated "I am enclosing duplicate original of overriding royalty contract... conveying to A.S. Cain, Jr. a 1/48th overriding royalty ... instead of conveying these royalties to L.H. Perez as originally written."
[17] Well after the 1936 and 1938 base leases and the litigation of the early 1940's, as recently as the mid 1960's, Delta Development Co., Inc. did enjoy financial advantage as a consequence of the Perez's conflicts of interest and apparent breaches of fiduciary duty, conflicts and breaches which on the present record, were not known to the Council, or reasonably knowable.

In 1963 Gulf Oil Corp. was producing, or preparing to produce, minerals on a state lease. Delta took the position that their own base lease with Grand Prairie, and leases which Delta had taken from private landowners, covered the same area; that Grand Prairie's or the private lessors' titles to the land was superior to that of the State of Louisiana, and that Delta's leases (from Grand Prairie and the private landowners) were therefore superior to Gulf's state leases. Delta negotiated a compromise with Gulf, Mississippi Fuel Corp., and Hope Natural Gas Corp., (a "Memorandum of Agreement"), by which Delta acquired a 1/48 overriding royalty interest in the large land area.
In this document, to which the Council was not a party, Delta agreed as part of the compromise to get the Council to forego claim to any part of mineral production in that acreage until and unless the Council should later assert and prove title. Such assertion and proof of title apparently was never undertaken by the Council, whose President was Leander Perez, Sr. and whose statutory "regular" attorney was Leander Perez, Jr., a stockholder in Delta. In a separate letter agreement dated October 10, 1963, and signed by Judge Perez in his capacity as President of the Plaquemines Parish Commission Council, the Council agreed to forego claim to any part of the aforestated mineral production. The Council apparently did, in that same transaction, receive a royalty for production from a much smaller adjoining area which had been acquired by the Grand Prairie Levee District from the State of Louisiana in 1950. In that October 10, 1963 letter, no mention is made of the overriding royalty interest obtained by Delta in the "Memorandum of Agreement" as to that same acreage.
In a resolution dated February 13, 1964, a unanimous Council including Leander H. Perez, Sr., voted to adopt the terms of the letter agreement earlier signed by Perez. More likely than not Perez did not inform the other Council members that Delta was owned by his four children, and that coincident with, and in part as a consequence, of the Council's giving up claim to production. Delta was securing a 1/48 overriding mineral royalty on the same land.
In the negotiations which led to this 1963 compromise, an attorney for Gulf in a letter to a Mr. Plauche, an attorney for Delta, made inquiry as to whether Delta contemplated "making some small settlement" with the Plaquemines Parish Commission Council. The same attorney later wrote his client, Gulf, and said:
Chalin and Billy have determined that the Plaquemines Parish Commission Council does not have a claim to title to these areas ... Therefore, they do not plan to transfer any portion of the 1/48th overriding royalty interest to the Council....
Approximately one month later, Chalin Perez wrote to Plauche, concerning the Grand Prairie Levee District lease "problem." Chalin Perez noted that he "discussed this approach with L.H.P. and he agrees with it."
Evidence of another conflict appears in a compromise agreement dated May 1, 1961, an agreement which was entered between Delta, Gulf Oil Corp., and the Estate of William G. Helis concerning lands covered by the Grand Prairie lease. Two separate documents set forth the terms of the compromise. In an "Agreement" between the Plaquemines Parish Police Jury and Delta, Delta conferred upon the Police Jury a compensatory royalty of $100,000 and an additional royalty interest of 3/128. This document was recorded in the conveyance records of Plaquemines Parish. However, in a separate instrument executed by Delta, Gulf, and the Estate of William G. Helis on the same date, Delta received an equal $100,000 and royalty interest of 3/128 from Gulf and the Estate of Helis which was not passed on to the Council. The Police Jury was not a party to this agreement. A handwritten notation on the bottom reads "DO NOT RECORD THIS INSTRUMENT."
From the fact that the Police Jury-Delta "agreement" makes no mention of Delta's simultaneous receipt from Gulf and the estate of Helis, of an equal additional consideration, a fair inference can be drawn that the Police Jury was not informed of this separate acquisition. Nor is it evident from the documents why the Council was entitled to simply one-half of what Gulf-Helis was willing to give up in compromise, nor that the Council and Delta were knowingly agreeing to that division of the acquisition.
The Council also introduced a set of correspondence from the files of the California Company (now Chevron Oil Company) which depicts separate compromise agreements between Chevron and Delta, and Chevron and the Grand Prairie Levee District. With respect to the latter a letter agreement between Grand Prairie and Chevron dated April 21, 1967, was accepted and signed by Judge Perez on behalf of the Plaquemines Parish Commission Council, as governing authority of the Grand Prairie Levee District. In the compromise letter agreements between the Grand Prairie Levee District and Chevron, the overriding royalty interests concurrently acquired by Delta are not mentioned.
[18] Only the levee board-Delta leases and the Delta-Gulf subleases were purportedly recorded in the Plaquemines Parish conveyance office.
[19] For one thing, the corporation, Delta Development Co., Inc. had as its registered office Judge Perez's New Orleans law office.
[20] Concurrently, Judge Perez accused Judge Meraux of misconduct which purportedly rendered Judge Meraux unfit to hold office. In fact, Judge Perez instituted proceedings in this court to have Judge Meraux removed from office. Upon finding Judge Meraux had committed improprieties involving divorce and annulment cases in his court, our predecessors removed Judge Meraux from office. Perez v. Meraux, 201 La. 498, 9 So.2d 662 (1942).
[21] In actuality, the Crime Commission's funding came about when the Board of Liquidation of the State Debt passed a resolution whereby it transferred and appropriated $500,000.00 from a Property Tax Relief Fund for use by the commission.
[22] In Re: Eugene Stanley, Attorney General, and J. Bernard Cocke, District Attorney of Orleans Parish, Petitioning for an Open Hearing, Orleans Parish Criminal District Court, Case No. 102151.
[23] This petition was apparently preceded by unsuccessful attempts by the Crime Commission to subpoena the corporate documents of Delta-Louisiana. When Perez refused to respond to the Crime Commission's subpoenas, the above petition was filed.
[24] Among the defenses asserted were that the alleged fraudulent procurement of mineral leases was not a cognizable crime in Louisiana and that the sweeping subpoena duces tecum constituted an unreasonable search and seizure.
[25] Furlow had formerly been employed by the Crime Commission.
[26] Perez v. Furlow, 25th J.D.C., No. 1703.
[27] In the September resolutions, the levee boards clearly contended Judge Perez's personal interests were adverse to their interests. As a result of their suspicions concerning Judge Perez's involvement in the leasing of public lands, both boards apparently resolved to have Furlow and Blass investigate mineral leases and royalty transactions involving Judge Perez and the levee boards. When Judge Perez attacked the resolutions, the levee boards apparently chose to adopt the October resolutions in an attempt to clarify conflicts of interest which they felt they could more certainly prove.

The Buras Levee Board resolution also alleged a special necessity existed for Furlow and Blass to represent it in a lawsuit by the state against Gulf Refining Company. The more narrowly drawn October resolutions seem only inferentially related to the mineral leases and royalties made the object of this litigation. The focus of the October resolutions was the perceived conflicts of interest involved in Judge Perez concurrently representing the levee boards and the boards' adversary, the Police Jury.
[28] Perez v. Furlow, 25 J.D.C., No. 1717.
[29] Judge Perez alleged in his petition that he, as District Attorney and "regular attorney and counsel" for the levee boards, was entitled to injunctive relief "to maintain himself in peaceable possession of his office ... [as the] ex-officio... regular attorney and counsel" for the levee boards "against the unlawful interference by the said Thomas E. Furlow and William J. Blass...."
[30] The Lake Borgne Levee District was the third levee district involved the 1941 proceedings. Dealings with the Lake Borgne Levee District do not form a part of the instant lawsuit.
[31] Buras Levee District v. Perez, 25th J.D.C., No. 1716; Lake Borgne Levee District v. Perez, 25th J.D.C., No. 1718; and Grand Prairie Levee District v. Perez, 25th J.D.C., No. 1719.
[32] Perez v. Furlow and Blass, 25 J.D.C., No. 1703.
[33] Perez v. Furlow and Blass, 25 J.D.C., No. 1717.
[34] See supra note 31.
[35] In addition, Judge Perez testified he could advise the levee boards "honestly, sincerely, and to the best interests of the Parish of Plaquemines."
[36] As was noted, these narrower resolutions concerned Perez's conflicts in representing the levee boards and the Police Jury.
[37] Since the five lawsuits were so interrelated and had been consolidated at trial in the district court, it was only natural that they be used in argument by the parties, and reviewed by the Court.
[38] Page 19-20 supplemental brief filed to this Court in Case Nos. 36,714, 36,715 and 36,716.
[39] In his briefs to this Court, Judge Perez quoted from the September levee board resolutions, wherein the boards attempted to employ Furlow and Blass to investigate mineral lease and royalty transactions involving the boards. He then quoted his own transcript testimony that he was ready, willing, and capable of representing the levee boards as their attorney.
[40] The December 17, 1941 resolution reads, in pertinent part:

2,(a) WHEREAS, this Board, as then constituted, advised and influenced by the said Perez as its attorney, did on June 11, 1938, grant two separate oil, gas and mineral leases on separate areas of land owned by it to the Delta Development Company, Inc., which leases are recorded in Conveyance Office Book 88, page 453 and page 454, of Plaquemines Parish, and are still outstanding; and
(b) WHEREAS, this Board is informed and believes that, while acting as attorney for this Board and advising it with respect to said leases, the said Perez was, and is now, also attorney for said Delta Development Company, Inc., and did then and does now substantially own and absolutely control said Company; and
(c) WHEREAS, this Board is informed and believes that the said Delta Development Company, Inc., has received and continues to receive large sums, and the said Perez has received and continues to receive from said Delta Development Company, Inc., and from others, large sums as attorney fees, dividends and other payments, and other persons associated with the said Perez have received and continue to receive large sums, all on account of said leases and the development and production of oil thereunder, and in violation of the rights of this Board; and
* * * * * *
BE IT RESOLVED BY THE BOARD OF COMMISSIONERS OF THE BURAS LEVEE DISTRICT, That, for the reasons set out in the foregoing preamble, there is a real necessity for the employment of special attorneys by this Board in each of the special matters described, and this Board does hereby employ Thos. E. Furlow and Wm. J. Blass of New Orleans as special attorneys and counsel. Said special attorneys are hereby authorized and empowered, in the name and behalf of this Board, to make full and complete investigation by all legal means, including actions for discovery and investigation, of each of the oil, gas and mineral leases herein described and all amendments and supplements thereto, of all agreements and assignments affecting, bearing upon or relating to said lease or to rents, royalties and other payments thereunder or in connection therewith, of development, operation and production under said lease, and of any and all transactions with respect to said lease or to development, operation and production thereunder; and said special attorneys are hereby further authorized and empowered, in the name and behalf of this Board, to make such demands and to institute and prosecute to the conclusion such suits as may be necessary for the recovery by this Board of any moneys, rights or interests to which it may be entitled under each of said leases or any transactions with respect thereto or to development, operation and production thereunder, and such suits as may be necessary to annul or rescind said lease.
[41] Adolph v. Board of Commissioners, 25th J.D.C., No. 1733; L.G. Evasovich v. Board of Commissioners, 25th J.D.C., No. 1734.
[42] Cases 1703, 1716, 1717, 1718, and 1719.
[43] As has been discussed, the act delineated the circumstances when "special counsel" could be employed by the levee boards in lieu of using their statutory counsel, the District Attorney.
[44] 1940 La.Acts No. 16 made it a felony to conspire to defraud political subdivisions of the state. Persons convicted under this act could be punished by "hard labor for not more than two years nor less than six months and shall be fined not more than $2,000.00 nor less than $500.00, or both." Id.
[45] The correspondence reads, in pertinent part:

* * * * * *
Inasmuch as all the Acts complained of and which are the basis of the charges against these men, who are members of the Grand Prairie and Buras Levee Board, were approved by the Attorney General of Louisiana, and by the Governor of Louisiana, and were done under the approval and with the sanction of those officials, and only after consultation with them; and inasmuch as my clients believe with justification that these charges are merely brought for the purpose of the District Attorney of the 25th Judicial District intimidating my clients and preventing them from going further in their efforts to recover certain property belonging to the Board, and to stop them from further investigating his acts as Attorney Ex-Officio for the Board during the years 1937, 1938, and 1939, I believe that it would be imminently unfair to permit that official to use his office for the purpose of attempting unjustly to prosecute these men who acted in good faith and only after consultation with the duly elected officials of the State, and the Legal Advisors of the Board.
* * * * * *
* * * * * *
[T]he said L.H. Perez further misusing and abusing the powers possessed by him as District Attorney of the 25th Judicial District, and in an attempt to intimidate the Attorney General of the State of Louisiana, from proceeding with the investigation now pending before the Criminal District Court for the Parish of Orleans, as well as in an attempt to intimidate him as Attorney General of the State of Louisiana, from investigating the said oil and mineral leases, and while the said injunction suit was still pending on appeal to the Supreme Court, went before the Grand Jury of the Parish of Plaquemines and submitted an indictment to the said Grand Jury, alleging that defendants, the members of the Grand Prairie Levee Board and the Buras Levee Board had illegally used the funds of the said Boards, the said Perez being actuated with the further thought and desire to intimidate the members of the said Board, as well as the Attorney General of the State of Louisiana, from proceeding to investigate the said mineral leases, the Grand Jury of the Parish of Plaquemines at the insistence and under the official domination of the said Perez, returned a true bill against defendant and against the said Furlow, alleging a violation of Act 16 of 1940.
These indictments Nos. 779; 780; 781 and 782 were in and are in furtherance of a conspiracy entered into by the said Perez and his associates to protect themselves against the legal consequences of a disclosure of their past activities, in securing for themselves the mineral resources of the political bodies and subdivisions of which the said Perez was the ex-officio advisor.... That the said Perez is attempting to illegally [use] the powers of his office of District Attorney of the 25th Judicial District for the Parish of Plaquemines and of the Parish of St. Bernard, to protect himself and his associates against an investigation and an inquiry into the acquisition of the mineral rights, royalties, bonuses, leases, etc., so acquired by them. (emphasis supplied.)
[46] Quierry's Executor v. Faussier's Executors, 4 Mart. (o.s.) 609 (La.1817), where the Louisiana Supreme Court held that a one year prescriptive period for an executor to bring suit was suspended by a statute of the Legislature which prohibited the commencement of any suit for a specified one hundred twenty day period in the year 1815.
[47] Orleans Parish School Board v. Pittman Construction Co., 261 La. 665, 260 So.2d 661 (1972), (where it was held essentially that a cause of action cannot be asserted before it accrues); Dalton v. Plumbers and Steamfitters Local 60, 240 La. 246, 122 So.2d 88 (1960), (where it was held that a one year prescriptive bar to a member's suit against his union for wrongful expulsion did not commence to run until his appeal to the union's general executive board had been concluded).
[48] Hyman v. Hibernia Bank & Trust Co., 139 La. 411, 71 So. 598 (1916) (where this Court found contra non valentem applicable and prescription interrupted in a situation in which a creditor bank conspired with its debtor to deprive a landlord of its lessor's pledge on goods on leased premises, by paying rent to the landlord in order to lull the landlord into a false sense of security while removing goods from the premises).
[49] In 1982 La. Civ. Code Ann. art. 3521 (West 1953) was superceded by id. art. 3467 (West Supp. 1987). Prior to 1870, the same language (of former art. 3521) was contained in former art. 3487 (Civil Code of 1825).
[50] See, generally Pothier, Law of Obligations or Contracts, pt. 3, ch. 8 (1853).
[51] Hyman v. Hibernia Bank & Trust Co., 139 La. 411, 71 So. 598; Dagenhart v. Robertson Truck Lines, Inc., 230 So.2d 916, 918 (La.App. 1st Cir. 1970).
[52] Later cases have acknowledged that the equitable nature of the circumstances in each individual case has determined the applicability of the doctrine. Nathan v. Carter, 372 So.2d 560 (La.1979); Dagenhart v. Robertson Truck Lines, Inc., 230 So.2d 916 (La.App. 1st Cir.1970).
[53] In fact there was more than just a failure to divulge and a continuing duty to do so. There were the compromises, in the mid 1960's entered with oil companies, by the Council and Delta separately, instances in which Judge Perez acted in a clearly affirmative way while burdened with conflicts of interest. For particulars concerning the compromise agreements, see supra note 17.
[54] As we have noted, 1912 La.Acts No. 125 and its successor, La. Rev. Stat. Ann. § 42:261, et seq. (West 1965) allowed for the employment of a "special" attorney (other than the levee boards' "regular" counsel, the district attorney) only when a "real necessity" existed. And La. Rev. Stat. Ann. § 13:4861 (West 1968) provides that "the State of Louisiana and any parish, ... board, commission, or public body ... shall have a right of action for discovery and investigation...."
[55] The record contains at least two instances where, in 1963, Chalin Perez was the addressor on correspondence written to further the interests of Delta.
[56] Although the record is not entirely clear in this regard it appears that Leander Jr. and Chalin, and their sisters Joyce and Betty each received approximately 25% of the stock when it was donated to them by Judge and Mrs. Perez in 1944.
[57] It is also the contention of the plaintiff that Joyce Perez Gelpi, one of the two daughters, and Richard Carrere, husband of the other, were at one time officers of Delta.
[58] For at least two cases in which corporations were charged with the personal conduct of corporate officers or stockholders, see B & R Construction Co. v. Duvigneaud, 172 So.2d 919 (La. App. 4th Cir), writ refused, 247 La. 1010, 175 So.2d 300 (La.1965), and Taylor v. Newton, 117 Cal.App.2d 752, 257 P.2d 68 (1953). And for a discussion of the treatment of members' acts as corporate acts, see Fletcher Cyc. Corp. § 42 (Rev.Ed.1983).
[59] The defendant Joyce Perez Gelpi's husband Chester Gelpi may not have been a donee. While he remains a defendant, the record indicates that plaintiff may be contemplating dismissing the lawsuit as to him.
[60] Thomas Perez Eustis, a grandson of Judge Perez, and a named defendant in this case, testified at the trial of the exception. During his testimony, the following exchange took place:

Q. Mr. Eustis, it was your purpose in not recording these [donation] documents to keep it off the public records, is that correct?
* * * * * *
A. Our purpose is to keep our business our business.
Q. To keep it private, isn't that correct, sir?
A. Yes.
Q. And not disclose about counter letters and the sources of the income?
A. We wanted to keep our business private, yes.